**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| STS SOFTWARE SYSTEMS, LTD., and NICE SYSTEMS, LTD., | : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:04-CV-2111-RWS |
| v. | : : | |
| WITNESS SYSTEMS, INC., | : : | |
| Defendant. | : | |

## <u>ORDER</u>

This case came before the Court for a bench trial beginning March 17,

2008.  Following the trial, the parties submitted Proposed Findings of Fact and

Conclusions of Law.  The Court enters the following Findings of Fact and

Conclusions of Law based upon the evidence submitted at trial as well as

arguments and papers submitted by counsel.  A version of this Order with

source code references redacted shall be filed as a part of the public record.  A

complete version of the Order, including source code references, shall be

simultaneously filed under seal.

I.      **BACKGROUND**

    A.   **The Parties**

1.      Plaintiff STS Software Systems, Ltd. ("STS") is a wholly-owned subsidiary of NICE Systems Ltd. that serves as a patent holding company and owns the patent-in-suit, U.S. Patent No. 6,871,229 ("the `229 Patent").

2.      Plaintiff NICE Systems Ltd. ("NICE") is an Israeli corporation that develops, manufactures and sells products that incorporate technology relating to recording and analysis of telephone calls to business and governmental enterprises throughout the world.  NICE is the exclusive licensee of the `229 Patent.

3.      Witness Systems, Inc. ("Witness") is a U.S. corporation, which, like NICE, develops and sells products utilizing telephone call recording technology to business and governmental enterprises.[1]

    B.   **Procedural Background**

4.      On July 20, 2004, STS filed its initial complaint in the Southern District of New York alleging that Witness infringes United States Patent No. 6,122,665 ("the `665 patent").  (DTX 351 at 3.)  Witness filed a declaratory

---

[1] In 2007, Verint Systems, Inc. Acquired Witness and Witness became Verint Americas Inc. (Doc. No. 336 at Ex. E, Stip. Facts K-N).  For ease of reference, Witness Systems, Inc. and Verint Americas, Inc. are referred to herein as "Witness."

judgment action that same day in the Northern District of Georgia seeking a

declaration that Witness did not infringe any valid claim of the `665 patent.

(D1 at 4-5.)  STS's infringement action was later transferred to the Northern

District of Georgia and consolidated with Witness' declaratory judgment action.

(D49 (Order).)

5.      On July 7, 2005, STS filed a supplemental complaint, alleging that

Witness infringes United States Patent Nos. 6,880,004, ("the `004 patent"),

6,871,229 ("the `229 patent") and 6,865,604 ("the `604 patent"), in addition to

the previously asserted `665 patent.  (D83.)

6.      On February 2, 2006, STS provided Witness with a covenant not to

sue in connection with the `665 patent, pursuant to which the Court dismissed

all claims in this litigation relating to the `665 patent.  (D196.)

7.      On January 16, 2007, the Court adopted Judge Roderick

McKelvie's Report and Recommendation on claim construction.  (D251;

D258.)

8.      After the Special Master issued his Report and Recommendation

on claim construction (D251), but before it was adopted by the Court (D258),

STS moved for leave to join NICE as a co-plaintiff.  (D257.)  The Court granted

the motion to join NICE (D285), and on June 27, 2007, STS/NICE filed a

AO 72A
(Rev.8/82)

second supplemental complaint, jointly alleging that Witness infringes the `229

patent, the `604 patent, and the `004 patent (D286).

9.    At that point, based on STS/NICE's 4th Supplemental

Infringement Contentions, STS/NICE was asserting infringement of thirty-eight

claims across the three different patents, specifically deleting any reliance on

Cisco Systems, Inc. ("Cisco"), Avaya, or Nortel Networks Corp. ("Nortel")

telecommunications products, replaced with a new focus on the conventional

operations of a generic network interface card (NIC) and widely-used Microsoft

Windows and Linux operating  systems.  On September 27, 2007, the Court

held a telephonic hearing, during which it directed STS/NICE to narrow its list

of claims it intended to assert at trial.  (D303.)  Accordingly, on October 3,

2007, STS/NICE advised Witness that it would only assert infringement of ten

claims from the three patents then at issue.

10.    On March 7, 2008, ten days before trial, STS/NICE withdrew its

claims of infringement on the `004 and `604 patents.  (D336 at 17.)  On March

11, 2008, STS/NICE offered a covenant not to sue Witness for any

infringement of the `004 and `604 patents.  Witness accepted the covenant on

March 13, 2008, and agreed to withdraw its counterclaims of non-infringement

and invalidity with respect to the `004 and `604 patents.  Accordingly, only the

4

six claims of the `229 patent remain at issue in this case.  (Tr. at 85 (Dr. Jeffay);

Tr. at 1016:12-24.)

### C.  <u>Background of the Technologies at Issue</u>

11.    The `229 patent relates to technology for monitoring, recording,

and replaying communications sessions transmitted over a packet-switched

computer network.  Packet-switched networks were developed more than thirty

years ago, and unlike circuit-switched networks, do not rely on dedicated

circuits (or channels) between callers.  (Tr. at 347 (Testimony of Mr. Nisani);

Tr. at 1133 (Testimony of Dr. Cohen).)  Before a call can be transmitted over a

packet-switched network, the corresponding analog audio signal must be

translated into a digital signal that is made up of individual data units called

"packets."  Those packets are then routed individually over the computer

network to their intended destinations in accordance with a network protocol,

such as the now prevalent Internet Protocol (IP), that governs the routing and

delivery of packets on the network.  In 1981, the specification for IP version 4

was published, which has since been adopted for use in audio packet

transmission (more recently referred to as "Voice over Internet Protocol," or

"VoIP," in the commercial context).  (D251 at 5-6; DTX 138; Tr. at 1146:2-11,

1148:9-16 (Testimony of Dr. Cohen).)

5

12.    A packet generally consists of two parts:  (1) a "header," which is located at the beginning of a packet and contains information related to the transmission of the packet, such as destination address, port number, etc.; and (2) a "payload," which is the data being transported.  Some packets may also contain a "trailer," which is located at the end of a packet and contains additional control information.  (D251 at 5.)

### D.   **Background of the Call Recording Industry**

13.    The call recording industry is primarily comprised of various business and governmental entities in the call center, trading floor and public safety and security markets. (Shamir Tr. Day 2 at 402:5-9)

14.    These entities rely on call recording products in order to record telephone interactions between their customers and their employees.  Telephone interactions are recorded for several purposes including:  (1) quality monitoring, where calls are recorded for "quality assurance purposes;" (2) compliance recording, where a company is required by law to record all calls, and/or (3) liability recording where calls are recorded to protect a company from liability where a transaction occurs solely over the telephone.  (Shamir Tr. Day 2 at 404:14-406:15).

6

15.     Customers of call recording products include not only end users of the product, but also, "channel partners" which operate to sell recording solutions to "channel partner" customers.  (Shamir Tr. Day 2 at 427:25-428:3). Channel partners incorporate a recording solution into telephony vendor equipment and sell this integrated product to their customers.  *Id.*  Examples of channel partners in the industry are Cisco, Avaya and Nortel.  *Id.*

16.     Prior to May, 2007, the call recording market was dominated by three key players: NICE, Witness, and Verint.  (Hegebarth Tr. Day 2 at 448:17-20).  Since May, 2007 (the date Verint acquired Witness), the market is now dominated by two players: NICE and Verint.  These two call recording providers make up 80% of the market. (PTX 245).

## II.     THE MEANINGS OF THE CLAIMS-IN-SUIT

### A.     Background of The Invention Disclosed in the `229 Patent

17.     Mr. Mordechai Nisani and Mr. Eitan Bar are the inventors of the `229 Patent.  (PTX 3).

18.     Before joining STS, Mr. Nisani developed software for communications systems over the course of four years of service in the Israeli army.  (Nisani Tr. Day 2 at 348:11-19).  In 1994, after leaving the army, Mr. Nisani joined STS as a software developer.  (Nisani Tr. Day 2 at 393:11-19).

7

19.     STS was a small company that developed, marketed and sold call recording products.  (Nisani Tr. Day 2 at 346:4-8; 17-22).  STS hired Mr. Nisani to develop call recording software for use in connection with Time Division Multiplexing ("TDM") circuit switched networks.  (Nisani Tr. Day 2 at 346:17-347:20, 355:8-12).

20.     TDM, which involves circuit switching of electronic signals carrying voice communications between two known paths, represents traditional telephony technology.  (Nisani Tr. Day 2 at  347:2-13).

21.     While employed by STS, Mr. Nisani learned about a recently issued communication standard known as H.323.  (Nisani Tr. Day 2 at 350:1-10) (Blair Tr. Day 3 at 521:2-16, agreeing that H.323 is "complex").  The H.323 standard allowed for building a phone system over a computer network (as opposed to relying on circuit switch networks found in the traditional TDM system).  (Nisani Tr. Day 2 at 350:7-10; Blair Tr. Day 2 at 505:25-506:4 (noting that there are major differences between TDM and packet-based networks).  The technology for transmitting voice over a computer network became known as Voice Over Internet Protocol or VoIP.

22.     Mr. Nisani recognized two main benefits for switching from traditional TDM telephony to VoIP networks.  (Nisani Tr. Day 2 at 350:21-

351:22).  First, switching to VoIP would allow for the consolidation of

infrastructure: requiring only one system to support email, computer networks,

and phone systems (as opposed to the three that would be required by the

traditional technology).  (Nisani Tr. Day 2 at 350:22-351:6).  Second, because

VoIP was software based, it provided for more flexibility to add additional

features.  (Nisani Tr. Day 2 at 351:15-22).

23.     Mr. Nisani realized that H.323 could begin to replace the

traditional TDM telephony technology that was then the mainstay of the market.

(Nisani Tr. Day 2 at 350:1-351:22).  He also realized that STS needed to

develop a call recording technology that functioned on a VoIP platform because

the existing TDM recorders would not function with VoIP.

24.     Mr. Nisani told Mr. Eitan Bar, the CEO of STS, that he believed

there would be a shift in the call recording market from TDM to VoIP and that

no other products on the market employed VoIP technology.  (Nisani Tr. Day 2

at 350:13-16; Nisani Tr. Day 2 at 351:23-352:10, 352:15-17).  Mr. Bar directed

Mr. Nisani to begin researching and developing a VoIP recording platform.

(Nisani Tr. Day 2 at 352:18-21).

25.     Mr. Nisani's research into developing a VoIP recording platform

began in early 1998.  (Nisani Tr. Day 2 at 353:8-14).  For approximately six

months, he dedicated all his time at STS solely to researching and developing a VoIP recording platform.  (Nisani Tr. Day 2 at 352:22-353:7, 353:15-355:7, 355:13-356:13, 356:24-557:4).  In his research efforts, Mr. Nisani found no reference to the use of H.323 in voice recording systems.  (Nisani Tr. Day 2 at 351:23-352:10, 352:15-17).

26.     On August 26, 1998, Mr. Bar and Mr. Nisani filed U.S. Patent Application No. 09/140,453 for VoIP call recording technology.   (Nisani Tr. Day 2 at 356:14-356:23; PTX 3, cover page of U.S. Patent No. 6,871,229 patent).  At that time, Mr. Nisani and Mr. Bar assigned all rights, title and interest in the application and all divisions and continuations of the application to STS.  (D336, Ex. E, Stip. Fact F).

27.     Mr. Nisani ultimately received four U.S. Patents, including the `229 patent, which relate to VoIP call recording technology.  (Doc. No. 336, Stip. Facts B through E).

   **B.   Asserted Claims**

28.     STS/NICE asserts infringement of the following claims of the `229 patent:  claims 7, 8, 11, 12, 15, and 22.  (D336 at 7.)  Several of these claims depend upon independent and/or dependent claims that STS/NICE is not asserting and which it has voluntarily disclaimed and dedicated to the public

domain, as identified below.  Set forth below are all of the asserted claims, as well as the independent and dependent claims on which the asserted claims depend:

Claim 3 (disclaimed):  A method for storing at least a portion of a computer network-based communication session being performed on a computer network between a packet source and a packet destination, the method comprising the steps of:

(a) receiving data packets on the computer network; [the "receiving" step]

(b) filtering each of the received data packets to accept the data packets that are associated with a session to be monitored; [the "filtering and accepting" step]

(c) analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs; and [the "analyzing" step]

(d) storing a portion of the communication session performed on the computer network. [the "storing" step]

Claim 7:  The method of claim 3 wherein the session to be monitored has a packet address which is one of an IP address of the packet source and the IP address of the packet destination. [the "IP address" element]

Claim 8:  The method of claim 3, wherein individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a session to be monitored. [the "accepts based on packet address" element]

Claim 11:  The method of claim 3 wherein the receiving step further comprises receiving data packets from a plurality of communication sessions. [the "receiving a plurality of sessions" element]

11

Claim 12:  The method of claim 3 further comprising the steps of: retrieving audio data, video data, or both audio data and video data contained in the data packets belonging to a specific communication session; restoring at least a portion of the communication session from the retrieved data; and displaying the at least a portion of the communication session. [the "retrieving," "restoring" and "displaying/outputting" steps]

Claim 13 (disclaimed):  A method for storing at least a portion of a communication session being performed on a computer network between a packet source and a packet destination, the method comprising the steps of:

> (a) receiving data packets on the computer network, the data packets containing at least the portion of the communication session containing audio data, video data, or both audio data and video data; [the "receiving" step]

> (b) filtering the data packets using filtering information;

> (c) accepting the data packets according to the filtering information; [the "filtering and accepting" step]

> (d) analyzing data within the accepted data packets to determine communication sessions to which the data packets belong; and [the "analyzing" step]

> (e) storing the portion of the communication sessions contained in the data packets according to the analyzing step. [the "storing" step]

Claim 15:  The method of claim 13, including the additional step of including in a database information extracted from the accepted data packet including one or more from the group of a packet address, a time, a date, a channel, a dialed number, and a caller identification. [the "extracting" step]

AO 72A
(Rev.8/82)

Claim 18 (disclaimed):  The method of claim 13, including the additional steps of organizing the data packets of a specific communication session. [the "organizing" step]

Claim 20 (disclaimed):  The method of claim 18, further comprising the step of outputting audio data, video data or audio and video data that is contained in the specific communication session. [the "displaying/outputting" step]

Claim 22:  The method of claim 20, wherein the outputting step further comprises the step of producing any audio data included in the organized data packets as sound through an earphone or a loudspeaker. [the "output via earphone or loudspeaker" step].

(DTX 3 at cols. 16-18.)

### C.  <u>Claim Construction</u>

#### (1)  <u>Markman Order</u>

29.    On March 14, 2006, the Court appointed Judge Roderick R. McKelvie as special master to supervise discovery proceedings, to preside over claim construction proceedings, and to submit a report and recommendation ("R&R") on claim construction to the Court.  (D205.)

30.    Judge McKelvie held a claim construction hearing on July 27, 2006 and rendered his R&R on October 10, 2006 (D251).  After considering the parties' objections to Judge McKelvie's R&R and reviewing the R&R de novo, the Court adopted the R&R in its entirety on January 16, 2007.  (D258.)

AO 72A
(Rev.8/82)

### (2)   The Preambles of Claims 3 and 13

31.   The preambles of claims 3 and 13 state:

| | |
|---|---|
| 3. A method for storing at least a portion of a computer network-based communication session being performed on a computer network between a packet source and a packet destination, the method comprising the steps of:  (claim 3(a)).  (PTX 3 at 16:16-19) | 13. A method for storing at least a portion of a communication session being performed on a computer network between a packet source and a packet destination, the method comprising the steps of:  (claim 13(a)).  (PTX 3 at 17:1-4) |

32.   During the claim construction phase of the case, neither party requested construction of any of the terms of the preambles.  (D209.)

33.   The preambles of claims 3 and 13 were not construed by the Court. However, STS/NICE asserts that the preambles include language that is utilized by the recited steps of claims 3 and 13 as well as the dependent claims at issue.

34.   The Court finds that the preambles of claims 3 and 13 do not give life, meaning, and vitality to the claims and thus, do not limit the claim scope for purposes of either infringement or invalidity.

### (3)   Claim Steps of Claims 3 and 13

#### a.   The "Receiving" Step of Claims 3 and 13

14

35.     Claims 3 and 13 respectively recite the following "receiving"

steps:

| | |
|---|---|
| (a) receiving data packets on the computer network; (PTX 3 at 16:20) | (a) receiving data packets on the computer network, the data packets containing at least the portion of the communication session containing audio data, video data, or both audio data and video data; (PTX 3 at 17:5-8) |

36.     The Special Master adopted the existing claim language of the

"receiving" steps of claim 3(a) and 13(a).  (D251 at p. 45).  Claim 3(a), requires

that data packets be received.  (Jeffay Tr. Day 1 at 85:21-25).  Claim 13(a)

requires that at least some of the data packets contain a communication session.

(Jeffay Tr. Day 1 at 85:25-86:2, 88:12-15).

   **b.** **The "Filtering" Steps of Claims 3 and 13**

37.     Claims 3 and 13 recited the following "filtering" steps

respectively:

| | |
|---|---|
| (b) filtering each of the received data packets to accept the data packets that are associated with a session to be monitored;( PTX 3 at 16:21-23). | (b) filtering the data packets using filtering information; (PTX 3 at 17:9) |

38.     The filtering steps of claims 3 and 13 were construed by the Court to mean: "filtering the received data packets."  (D251 at p. 45-46).  Dr. Jeffay, testified that "filtering the received data packets" means to accept some packets and reject others.  (Jeffay Tr. Day 1 at 86:6-12, 89:18-90:7).  Witness' experts did not disagree with this understanding of "filtering."

### c.     The "Accepting" Steps of Claims 3 and 13

39.     Claim 13 recites the following "accepting" step:

> (c) accepting the data packets according to the filtering information;

(PTX 3 at 17:11-12).

40.     The "filtering" step of Claim 3 includes reference to data packets that are to be accepted:

> (b) filtering each of the received data packets to accept the data packets that are associated with a session to be monitored;

(PTX 3 at16:21-23).

41.     The Court did not construe the "accepting" step.  Dr. Jeffay testified that the "accepting" step requires only that the filtered data packet be passed to a next level of processing.  In other words, if a data packet is not discarded by the filtering step, then it is accepted.  (Jeffay Tr. Day 1 at 86:12-14, 91:8-15).

16

### d.    The "Analyzing" Step of Claims 3 and 13

42.    Claims 3 and 13 recite the following "analyzing" steps respectively:

| (c) analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs; (PTX 3 at 16:24-26) | (d) analyzing data within the accepted data packets to determine communication sessions to which the data packets belong; (PTX 3 at 17:13-15) |
|---|---|

43.    The analyzing steps of claims 3 and 13 were construed by the Court to mean:  "analyzing data within the accepted data packets to determine the communications sessions to which the data packets belong."  (D251 at p. 45).

### e.    The "Storing" Step of Claims 3 and 13

44.    Claims 3 and 13 recite the following respective "storing" steps:

| "storing a portion of  the  communication session" (PTX 3 at 16:28-29); | "storing the portion of the communication sessions" (PTX 3 at 17:16-18). |
|---|---|

45.    The Court did not construe the meaning of the "storing" step but instead adopted the existing claim language.  (D251 at 45).

### f.    The Order of the Steps of Claims 3 and 13

46.    The Special Master construed independent claims 3 and 13 to require that the steps of the claims 3 and 13 be performed in the order set forth in the

17

claims.  (D251 at 35).  Accordingly, for a method to be found to be covered by claims 3 and 13, the steps of claims 3 and 13, respectively, must be performed in the order written by the accused method.  (Jeffay Tr. Day 1 at 95:10-21).

47.    Witness argues that the language of claims 3 and 13 requires that multiple packets be received, filtered, analyzed and stored as a group at each of those steps.  (T. Williams Tr. Day 4 at 988:6-15). Witness relies on the language of claim 10 of the `665 patent, which is not in suit (T. Williams Tr. Day 4 at 987:16-988:5) and the recitation of "packets" in claims 3 and 13.  However the specification of the `229 Patent does not describe the processing of packets as Dr. Williams describes.  Instead, it describes the processing of individual packets. (*See, e.g.,* PTX 3 at 9:45-10:18).

> **(4)    Claims 12, 20, and 22 - Displaying the Stored Communication Session**

48.    Claims 12, 20 and 22 relate to the displaying or playback of stored communication session data.  These claims read as follows:

> Claim 12:  The method of claim 3 further comprising the steps of: retrieving audio data, video data, or both audio data and video data contained in the data packets belonging to a specific communication session; restoring at least a portion of the communication session from the retrieved data; and displaying the at least a portion of the communication session.

18

(PTX 3 at 16:60-67).

> Claim 20:  The method of claim 18, further comprising the step of outputting audio data, video data or audio and video data that is contained in the specific communication session.

(PTX 3 at 18:9-11).

> 22. The method of claim 20, wherein the outputting step further comprises the step of producing any audio data included in the organized data packets as sound through an earphone or a loudspeaker.

(PTX 3 at 18:15-17).

49.     Claim 20 was not construed by the Court, although the term "audio data" was defined to mean  "information representing audible sounds."  (D251 at 46).  Claim 22 further limits that outputting of claim 20 to the production of audio data as sound through an earphone or loudspeaker.  (Jeffay Tr. Day 1 at 97:25-98:9).

50.     Claim 12 divides playback into three steps of: (1) retrieving the stored audio data; (2) restoring that data; and then "displaying" the audio data. (Jeffay Tr. Day 1 at 96:23-97:6).  The specification of the `229 Patent defines the term "display" to include "both the visual display of video data, and the production of sound for audio data."  (PTX 3 at 5:24-26; Jeffay Tr. Day 1 at 97:7-13).

51.    The "restoring" step of claim 12 was not construed by the Court.

The plain and ordinary meaning of "restoring" is to put back into the correct

order.  (Jeffay Tr. Day 1 at 122:3-123:9).

### (5)    Claim 7

52.    Claim 7 reads:

> Claim 7:  The method of claim 3 wherein the session to
> be monitored has a packet address which is one of an IP
> address of the packet source and the IP address of the
> packet destination.

(PTX 3 at 16:41-44).

53.    The Court construed "IP address" to mean a "network-layer

address in a TCP/IP network."  This claim further limits claim 3 to require that

the session that is being monitored in claim 3 has a packet address which is an

IP address of either the source or the destination.  (Jeffay Tr. Day 1 at 96:2-8).

### (6)    Claims 8 and 15

54.    Claim 8 and 15 relate to the use of a database in the process of

claims 3 and 13 respectively.

| Claim 8: The method of claim 3, wherein individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a session to be monitored. (PTX 3 at 16:46-49). | Claim 15: The method of claim 13, including the additional step of including in a database information extracted from the accepted data packet including one or more from the group of a packet address, a time, a date, a channel, a dialed number, and a caller identification. (PTX 3 at 17:21-25). |
|---|---|

55.     Claim 8 requires that a condition by which a data packet survives the filtering step of claim 3 is that  the data packet has any address that is associated in a database with a session to be monitored.  (Jeffay Tr. Day 1 at 96:9-14).

56.     Claim 15 requires that a database is used to hold data such as a packet address, a time, a date, a channel, a dialed number and/or a caller identification.  This data is extracted from a data packet that is accepted. (Jeffay Tr. Day 1 at 97:17-24).

### (7)     __Claim 11__

57.     Claim 11 reads:

>    11. The method of claim 3 wherein the receiving step
>    further comprises receiving data packets from a plurality
>    of communication sessions.

(PTX 3 at 16:56-58).

58.    Claim 11 was not construed by the Court.  Claim 11 specifies that packets from a plurality (two or more) of communication sessions are received by the receiving step of claim 3.  (Jeffay Tr. Day 1 at 96:18-22).

### (8)    Claim 18

59.    Claim 18 (from which claim 22 depends through claim 20) concerns a step of organizing data of the communication session.  It reads:

> Claim 18: The method of claim 13, including the additional steps of organizing the data packets of a specific communication session.

(PTX 3 at 18:4-6).

60.    Claim 18 was not construed by the Court, nor was the claim term "organizing" construed.  Therefore the term "organizing" has its plain and ordinary meaning, which is to place data in a proper order.  (Jeffay Tr. Day 1 at 98:10-13, 129:18-130:3).

### (9)    Other Claim Terms and Issues

61.    The following claim terms appear in various claims at issue and were construed by the Court as follows:

> "communication session"-both a conversation, in which at least two parties converse by exchanging audio and/or video information in "real time," and a message, in which at least one party records such audio and/or video information for reception by at least one other party at a later date.

22

(D252 at 46.)

> "data packet" – entire data unit containing a header and, in some cases, a payload.

(D251 at p. 46)

> "audio data" – information representing audible sounds.

(D251 at p. 46).

62.    Witness argues a claim construction whereby data representing the communication session that is processed by the various steps of the various claims, (e.g., receiving, analyzing, restoring) must remain unchanged throughout the processes.  (Jeffay Tr. Day 1 at 989:3-21).  This claim construction argument ignores the meaning of "audio information" of a communication session as well as the meaning of "audio data," which is "information representing audible sounds."  As Dr. Jeffay explained:

> [a]udio data was construed to be information representing audible sounds.  So, the issue isn't the 1s and 0s here.  The issue is what are the audible sounds that are involved here.  And while the data certainly is compressed, it doesn't change the audible sound.

(Jeffay Tr. Day 5 at 1231:19-23; *see also* 1231:10-1232:16).

63.    In a related argument, Witness proffers that antecedent basis similarly requires that the same audio received as part of the communication

session be the same audio that is retrieved in claim 12.  (T. Williams Tr. Day 4 at 998:7-999:6).  However, as Dr. Jeffay explained, this argument focuses on the exact data carried in the data packets, rather than on the information carried and what that information represents, and leads therefore to illogical conclusions:

> "[a]nd just from a logic standpoint, that makes no sense because, remember, there's a filtering step after receiving. So, filtering's going to throw away stuff. So you can't -- if you throw away stuff, you can never retrieve -- you can never retrieve it later.

(Jeffay Tr. Day 5 at 1231:5-9).

Moreover, Dr. Williams never testified that the audio that is received would sound different once it was played back.

## III.   THE ACCUSED PRODUCTS

64.   Witness designs, manufactures, sells, and offers to sell and support certain products in the United States that are capable of recording VoIP telephone calls.  (PTX 66 at p. 15; PTX 55 at p. 13; Treaster Tr. Day 3 at 666:6-10, 725:5-13, 727:9-18;  Blair Tr. Day 4 at 821:24-822:3).

65.   Those products have been identified as:  Impact 360 Compliance Recorder (also known as ContactStore for IP ("CSIP")) (PTX 87), primarily used in Cisco telephony environment; ContactStore for Communication

24

Manager ("CSCM") for use in Avaya telephony environments (PTX 88); and

Nortel Quality Monitoring and Nortel Contact Recording (also collectively

known as Nortel Contact Recorder ("NCR")) (PTX 96), for use in Nortel

telephony environments, and such products made, used, sold and offered for

sale by Witness Systems under other brand and model names, e.g., Impact 360.

(Treaster Tr. Day 3 at 713:19-714:7; Jeffay Tr. Day 1 at 98:22-100:10).

### A.   Contact Store for IP (CSIP)

66.   ContactStore for IP ("CSIP") is part of Witness' suite of products

for recording and replaying voice interactions.  CSIP focuses on passive

recording of VoIP interactions by receiving all visible packets and then

processing the information in the IP, UDP and RTP headers.  Unlike "active"

recorders that rely on a sender to transmit audio data packets directly to the

recorder, CSIP records interactions acquired through passive monitoring only.

(DTX 243; Tr. at 980:13-24 (Dr. Williams).)

67.   CSIP acquires all visible packets using a standard NIC in

promiscuous mode, which means that the NIC allows all packets, not just those

packets addressed to that NIC (Tr. at 911:1-5 (Dr. Blair).)

68.   If the audio carried by a recorded packet was transmitted in an

uncompressed format, CSIP changes the representation of the audio into a

compressed format after the system finishes recording the interaction. The original uncompressed audio data contained in the data packets is discarded. This process of changing the information representing an audible sound is called "transcoding." (DTX 94 at WSDEPROD1530395; Tr. at 949 (Mr. Spohrer); Tr. at. 996:21-997:13 (Dr. Williams).)

69.     When CSIP receives a request from a user to replay a transcoded interaction, the transcoded audio data, not the incoming audio data contained in data packets exchanged between the parties to any particular conversation, is the audio data transmitted to the user's computer, where it is replayed. (*Id.*)

70.     CSIP users control its operation in several ways. Users control the topology of their networks and choose whether to present any packet traffic to CSIP other than voice recording traffic. (PTX 66 at 109-110, 114.) Users also control the audio format for recordings at their site and can choose whether CSIP will transcode completed recordings. (DTX 94 at WSDEPROD1530395.) Finally, users choose the extensions they wish to record, and the recordings they wish to replay.

### B.   Contact Store for Communication Manager (CSCM)

71.     ContactStore for Communication Manager ("CSCM") is part of Witness' suite of products for recording and replaying interactions in customer

26

contact centers.  CSCM records interactions managed by an Avaya

Communication Manager telephone switch, including VoIP and TDM

communications.  CSCM relies on Avaya's Communication Manager

Application Programming Interface ("CMAPI") to obtain relevant audio

interactions to record.   Avaya's Communication Manager addresses audio data

packets directly to CSCM or other third-party recorders—a method of  "active"

recording.  (DTX 253; Tr. at 853:3-855:18 (Dr. Blair); Tr. at 978:4-979:13 (Dr.

Williams).)

      72.    When accessing data from the network, the CSCM recorder relies

on the normal operation of the operating system of the computer on which it

runs.  The computer's operating system obtains packets using a standard NIC

connecting the computer to a segment of the network.  The NIC operates in its

normal mode, which accepts a packet traversing that segment only if the packet

is addressed to that NIC.  Networking software within the operating system

processes each packet in turn according to the protocols a packet uses.  Each

RTP packet from the Avaya Communication Manager is processed at the IP and

UDP layers.  The operating systems and NIC card are agnostic to the type of

payload, whether voice, email or WordPerfect documents.  (Tr. at 839:4-11

(Dr. Blair); Tr. at 944:7-945:5 (Mr. Spohrer); Tr. at 981:19-982:6; 982:21-983:2 (Dr. Williams).)

73.     CSCM relies on a separate stream of computer telephony integration ("CTI") information from the Avaya Communication Manager to determine which recordings relate to particular calls or conversations.  (DTX 253; Tr. at 853:3-855:18 (Dr. Blair); Tr. at 978:4-979:13 (Dr. Williams).) Before directing audio packets to CSCM, the Avaya Communication Manager switch replaces the audio data carried by the original packets with mixed audio data.  If the audio carried by a recorded packet was transmitted in an uncompressed format, CSCM changes the representation of the audio into a compressed format after the system finishes recording the interaction.  The original uncompressed audio data contained in the data packets is discarded. This process of changing the information representing an audible sound is called "transcoding."    (DTX 93 at STS024235, Tr. at 990:16-23 (Dr. Williams).)

74.     When CSCM receives a request from a user to replay a transcoded interaction, the transcoded audio data, not the incoming audio data contained in data packets exchanged between the parties to any particular conversation, is the audio data transmitted to the user's computer, where it is replayed.  (*Id.*)

75.     The users of the CSCM system control its operation in several ways.  Users choose the audio format the Communication Manager uses for RTP transmissions and thereby control whether CSCM will transcode completed recordings.  (DTX 93 at STS024235)  In addition, users choose the extensions they wish to record, and the interactions they wish to replay.

### C.   Nortel Contact Recorder (NCR)

76.     The Nortel Contact Recorder ("NCR") is part of Witness' suite of products for recording and replaying voice interactions.  NCR records VoIP interactions involving IP handsets managed using Nortel's Meridian Link Server ("MLS"), such that the IP phone forwards a voice packet stream that is addressed directly to the recorder—another form of "active" recording.  (PTX 267; Tr. at 858:10-859:12 (Dr. Blair); Tr. at 979:14-980:12 (Dr. Williams).)

77.     Whether NCR records an interaction depends on the presence of CTI data the Nortel telephone system provides, rather than any information contained in the incoming audio packets.  (PTX 267; Tr. at 858:10-859:12 (Dr. Blair); Tr. at 979:14-980:12 (Dr. Williams).)

78.     When accessing data from the network, NCR relies on the normal operation of the operating system of the computer on which it runs.  The operating system obtains packets using a standard NIC connecting the computer

29

to a segment of the network.  (Tr. at 839:4-11 (Dr. Blair).)  The NIC operates in its normal mode, which accepts a packet traversing that segment only if it is addressed to that NIC.  Networking software within the operating system processes each packet in turn according to the protocols a packet uses.  The operating systems and NIC card are agnostic to the type of payload, whether voice, email or WordPerfect documents.  (Tr. at 982:6-983:2 (Dr. Williams).)

79.    NCR relies on CTI information, which Nortel delivers in a separate, dedicated stream, and which is not contained in the acquired voice packets.  If the audio carried by a recorded packet was transmitted in an uncompressed format, NCR changes the representation of the audio into a compressed format after the system finishes recording the interaction.  The original uncompressed audio data contained in the data packets is discarded.  As stated above with respect to CSCM, this process of changing the information representing an audible sound is called "transcoding."  (PTX 274 at WSISTS 055306; Tr. at 990:16-23 (Dr. Williams).)

80.    When NCR receives a request from a user to replay a transcoded interaction, the transcoded audio data, not the incoming audio data contained in

data packets exchanged between the parties to any particular conversation, is the audio data transmitted to the user's computer, where it is replayed.  (*Id.*)

81.     The users of the NCR system control its operation in a number of ways.  Users choose the audio format the IP handsets use for RTP transmissions and thereby control whether NCR will transcode completed recordings.  (PTX 274 at WSISTS 055306.)  In addition, users choose the extensions they wish to record, and the interactions they wish to replay.  (PTX 274.)

## IV.   INFRINGEMENT ANALYSIS

### A.   Claims 3 and 13

#### (1)    CSIP

##### (a)    The Receiving Step

82.     Claims 3 and 13 both require "receiving data packets on the computer network."  CSCM and NCR use the NIC in its so-called "normal" mode, in which only packets directly sent to that NIC are processed.  CSIP uses the NIC's so-called "promiscuous" mode, in which all packets on the network segment are processed, regardless of their destination.  This mode is commonly used for network analysis applications such as "packet sniffers."  Witness did not design or develop these network interface cards, which are standard hardware available prior to 1998 (*see* Williams Demo. at 76, below).  (Tr. at

839:4-11 (Dr. Blair); Tr. At 944:7-945:5 (Mr. Spohrer); Tr. at 982:21-983:2; 993:1-10 (Dr. Williams).)

83.　STS/NICE's infringement expert, Dr. Jeffay, points to a "hand-off" of packets from a third-party open-source software library named WinPCap to the CSIP recorder itself as meeting the "receiving" step.  (Tr. at 251:12-17 (Dr. Jeffay).)  WinPCap is a library of open-source functions designed to allow users to capture, transmit, and optionally filter network packets.  (Tr. at 945 (Mr. Spohrer); Tr. at 112:14-116:22 (Dr. Jeffay).)  Dr. Jeffay specifically testified that the WinPCap function [redacted] used by the CSIP source code file [redacted] performs the alleged "hand-off" from WinPCap to CSIP.  (Tr. at 110:11-111:13 (Dr. Jeffay), Jeffay Demo. at 50, 51.)

84.　Then, when discussing the "filtering" requirement, Dr. Jeffay relies only on optional filtering capability within WinPCap. (Tr. at 112-116 (Dr. Jeffay), Jeffay Demo. at 55-60.)  Even if a customer, against Witness' recommendation, elects to activate WinPCap filtering, WinPCap filtering always operates before the packets leave the WinPCap software library for the CSIP recorder.  After the "hand-off," packets are not returned from the CSIP recorder to the WinPCap software library for further processing.  Therefore, packets cannot be "received" by the CSIP recorder from the WinPCap software

AO 72A
(Rev.8/82)

library and then subsequently be subjected to "filtering" within the WinPCap

software library.  By relying on this sequence of operations, Dr. Jeffay has

broken the required sequence of steps for all claims of the `229 patent, which

require "receiving" to occur before "filtering."  (Tr. at 995:3-996:4 (Dr.

Williams).)

### (b)   The Filtering and Accepting Steps

85.     Claims 3 and 13 both require filtering and accepting packets.

86.     As noted above, STS/NICE alleges that CSIP meets the "filtering"

and "accepting" steps because it integrates a third-party WinPCap Filtering

function.  (Tr. at 112-116 (Dr. Jeffay), Jeffay Demo. at 56-60.)  Yet, because

the default setting for the WinPCap Filtering function in CSIP is "null" or "off,"

Witness does not intend for customers to activate the alleged "filtering"

function.  (Tr. at 188-194, 248, 286-287 (Dr. Jeffay); Tr. at 943-950 (Mr.

Spohrer); Tr. at 994:7-22 (Dr. Williams), Williams Demo. at 71-74.)  Also,

there is no evidence in the record of inducement—STS/NICE having failed to

identify any U.S. customer who has ever turned on or enabled the WinPCap

Filtering function.  (Tr. at 193-194, 286-287 (Dr. Jeffay); Tr. at 946 (Mr. Spohrer).)

87.    During STS/NICE's case-in-chief, Dr. Jeffay presented no other evidence to support his opinion that CSIP performs the "filtering" step other than the above-cited WinPCap functions.

88.    On rebuttal, Dr. Jeffay testified that other, different source code files satisfy the "filtering" step.  Specifically, Dr. Jeffay pointed to source code files [redacted] and [redacted] (Tr. at 1236-1243 (Dr. Jeffay).)  Witness objected to this new evidence not in Dr. Jeffay's original expert report on infringement.  (*Id.*)  Because this evidence was not in Dr. Jeffay's original expert report, and was presented for the first time during rebuttal, the Court has not considered or relied on this evidence in any way.

### (c)    The Analyzing Step

89.    Claims 3 and 13 required "analyzing the data within the accepted data packets to determine the telephone communication session to which the data packs belong."

90.    Witness' technical literature shows that the CSIP recorder analyzes a data packet.  (PTX 23 at p. 6 "The main task of the capture engine is to analyze IP packets. . . . The process of analyzing a packet is a matter of

34

matching the IP packet to an IP Pair of a stream and then passing the packet to the packet handler chain for analysis." ( Jeffay Slide No. 65; Jeffay Tr. Day 1 at 116:23-117:14)).

91.    The CSIP recorder examines the IP and UDP port numbers of the data packet in order to determine to which communication session the data packet belongs.  (Wright Dep. Tr. at 32:10-33:16; Jeffay Slide No. 66).

92.    CSIP version 7.3 source code shows that source and destination IP addresses and source and destination port numbers are extracted from data packets using a function called [redacted].  This source and destination IP address is then used to determine if this data packet relates to a communication session of interest using the [redacted].  (PTX 278 [redacted] Jeffay Slide No. 67; Jeffay Tr. Day 1 at 118:14-25).

93.    Identical functionality is provided for in the source code for version 7.7. of the CSIP recorder.  (PTX 279 [redacted]; Jeffay Slide No. 68; Jeffay Tr. Day 1 at 119:1-3).

AO 72A
(Rev.8/82)

**(d)** **The Storing Step**

94.     Witness' CSIP recorder stores at least a portion of a communication session as WAV files on a hard drive or archive drive so that the communication session can later be played back.  (Wright Dep. Tr. At 11:14-12.5, 18:16-19:3; PTX 66 at p. 26; Jeffay Slide No. 70; Jeffay Tr. Day 1 at 119:4-13).

95.     The source code for version 7.3 of the CSIP recorder uses a function called [redacted] to store audio data in a WAV file.  (PTX 278 [redacted]; Jeffay Slide No. 71; Jeffay Tr. Day 1 at 119:14-21).  The source code for version 7.7 of the CSIP recorder also uses a function called [redacted] to store audio data in a WAV file.  (PTX 279 [redacted]; Jeffay Slide No. 72; Jeffay Tr. Day 1 at 119:22-120:3).

**(2)** **CSCM**

**(a)** **The Receiving Step**

96.     Claims 3 and 13 both require "receiving data packets on the computer network."

97.     The Witness CSCM recorder receives data packets containing portions of communication sessions.  (PTX 43 at p. 18, CSCM recorder is labeled as "ContactStore for Communication Manager"; Jeffay Slide No. 115); PTX 13 at p. 15, CSCM recorder is labeled as "Witness ContactStore"; Jeffay Slide No. 117; Jeffay Tr. Day 1 at 183:4-6).

98.     Source code for versions 7.3 and 7.7 of the CSCM recorder demonstrates that the data packets are received by the recorder.  *See also* Linux source code's [redacted] at  PTX 283 [redacted], which is utilized by Witness' software for the CSCM recorder.

99.     Specifically, the function within the source code used to receive a data packet is identified as [redacted].  (Jeffay Tr. Day 1 at 137:9-20; Jeffay Slide No. 122; *see also* McKechnie Dep. Tr.[2] at 26:10-16, 47:18-48:14, 103:7–104:3; Wright Dep. Tr. at 65:9-66:6, 104:17-21, 107:19–108:5).

### (b)     The Filtering and Accepting Steps

100.    Claims 3 and 13 both require filtering and accepting packets.

101.    The Avaya Communication Manager switch determines which packets to send directly to CSCM, and thus the Avaya Communication Manager

---

[2]  Refers to designated deposition testimony of Scott McKechnie taken on March 20, 2007.

switch determines which packets arrive at the CSCM NIC and are subsequently passed through the CSCM operating system.

102.   STS/NICE alleges that CSCM meets the "filtering" and "accepting" steps because its operating systems (*i.e.,* Linux) matches packet destination address and port number with those of the recorder itself.  These functions are inherent in operating systems such as Linux, and Witness did not alter or customize any operating system in any way to facilitate the alleged "filtering" and "accepting" of data packets.  (Tr. at 981:19-982:6, 982:21-983:2 (Dr. Williams).)

103.   As noted in paragraph 101, Witness designed CSCM, as an  active recorder, with the intention that the Communication Manager switch will not send any packets to the recorders that are not intended for recording.  (Tr. at 983:3-21 (Dr. Williams).)

104.   Consequently, the CSCM recorder, when used as intended, only acquires packets that are directly addressed to it and has no need for the alleged "filtering" and "accepting" operations (*i.e.,* making a keep or discard decision). (Tr. at 983:3-21 (Dr. Williams).)

### (c)    The Analyzing Step

105.   Claims 3 and 13 require "analyzing the data within the accepted data packets to determine the telephone communication session to which the data packets belong."

106.   The CSCM recorder utilizes Avaya's Communication Manager API ("CMAPI") to analyze data packets to determine the communication session to which the data packet belongs.  The Avaya Communication Manager sends each stream of packet data for a communication session to a particular "UDP port."  (PTX 62 at p. 51 (representing that a communication session is sent to a respective UDP port of the CSCM recorder specified by the [redacted] function of CMAPI); Jeffay Slide No. 130).  Dr. Jeffay testified that: "[t]his is associating a UDP port with a communication session." (Jeffay at Tr. Day 1 at 139:12-140:1).

107.   Dr. Jeffay further testified, the way in which the CSCM "recorder differentiates . . . between communication sessions, is based on the UDP port number." (Jeffay Tr. Day 1 at 140:2-8).[3]

---

[3]  Additional evidence of the CSCM's operations in relation to the analyzing step can be found at McKechnie Dep. Tr. at 29:25– 30:6, 31:25–32:5, 53:21–54:6; 63:23–64:14, 65:5–10, 66:11–19, 71:17–25, 90:8–92:5, 94:13–95:10; 124:17-25, 135:7– 24, 147:17– 148:6; 83:11– 85:19, 86:18– 87:13, 71:17–25 and Wright Dep. Tr. at 104:10– 21, 176:17–177:4.

108.   STS/NICE asserts that version 7.3 of the CSCM recorder analyzes data packets for multiple concurrent communication sessions utilizing the [redacted] function to allocate a UDP port to be used for the analysis step. (PTX 278 [redacted]; Jeffay Slide No. 133; Jeffay Tr. Day 1 at 140:21-141:4). Similar source code and functionality is used for version 7.7 of the CSCM recorder.  (PTX 279 [redacted]; Jeffay Slide No. 134; Jeffay Tr. Day 1 at 141:5-10).

109.   However, the function of [redacted] is to open "sockets" or "communication paths" to the recorder such that the recorder stores any packet that may be sent to it, without regard to the packet's type or content.  This file contains no intelligence for distinguishing between "communication sessions". (DTX 335, DTX 337; Tr. at 856:857:1, 860:4-15 (Dr. Blair); Tr. at 987:5-15 (Dr. Williams).)

110.   STS/NICE also relies on deposition testimony of an Avaya engineer, Mr. Scott McKechnie, to establish that UDP port numbers "distinguish between" RTP streams that represent "conversations." (Jeffay Demo. at 131.)

40

111.    However, Mr. McKechnie testified at his deposition that "[t]he UDP port number does not differentiate between calls" and further that, when monitoring telephone conversations involving a "particular agent," there is "nothing in the UDP port association that says this is call one versus call two versus call three."  (McKechnie Dep. at 138:2-139:7; Tr. at 985:25-986:2 (Dr. Williams).)  Notably, Dr. Jeffay testified that his "expected notion" of a "communication session" is when "two parties converse by exchanging audio and video information in real-time" (Tr. at 340:21-25 (Dr. Jeffay)), the very sort of interactions that Mr. McKechnie described as incapable of differentiation via "UDP port association."

112.    The examination of UDP port numbers does not distinguish "communication session(s)," as that term is construed, because UDP port numbers do not identify different conversations or messages on a single socket. In CSCM, the same UDP port number is used repeatedly to record any traffic on a socket, thereby capturing many different interactions without any distinguishing ability.  The only information capable of delineating the different "communication sessions" to which particular audio packets belong is CTI data in an entirely separate packet stream.  That CTI data is not contained

in the same data packets that carry audio data. (DTX 335; Tr. 855:20-857:16 (Dr. Blair); Tr. at 984:15-985:25 (Dr. Williams).)

113. The Court's claim construction requires the analyzing step to be performed on the accepted data packets at a particular point in the sequence of steps - i.e., the point after "receiving," "filtering," and "accepting" and before "storing." The operations Dr. Jeffay identifies as "analyzing" cannot meet this claim.

### (d)   The Storing Step

114. Claims 3 and 13 require storing a portion of the communication session.

115. The CSCM recorder "records and stores telephone calls via IP." (PTX 43 at p. 19; Jeffay Slide No. 137; Jeffay Tr. Day 1 at 142:5-10; Wright Dep. Tr. at 109:13-20; Jeffay Slide No. 138; Jeffay Tr. Day 1 at 142:11-18; *see also,* Wright Dep. Tr. at 69:6– 70:17, 72:6–13, 81:15– 82:10, 107:22– 108:5).

116. The source code for version 7.3 of Witness' CSCM recorder includes a function called [redacted] which, in cooperation with the [redacted] call writes portions of the communication session data to a WAV file.  (PTX 278 [redacted]; Jeffay Slide No. 139; Jeffay Tr. Day 1 at 142:19-

24).  The same functionality is provided for in the source code for version 7.7. of Witness' CSCM recorder.  (PTX 279 [redacted]; Jeffay Slide No. 140; Jeffay Tr. Day 1 at 142:25-143:3).

### (3)   NCR

#### (a)   The Receiving Step

117.   Claims 3 and 13 both require "receiving data packets on the computer network."

118.   Duane Wright, Witness' System Architect Manager with knowledge of both the CSCM and NCR recorders, admitted that the NCR recorder receives data packets. (Wright Dep. Tr. at 156:15-22: " a stream that represents the audio that that phone user said, so it is the conversation, his part of the conversation in terms of his audio.  The other stream is the audio data that that phone received;"  Jeffay Slide No. 198).[4]

---

[4]  *See also*, Jeffay Tr. Day 1 at 159:22-160:3; diagram of "Audio via IP Stream" at PTX 18 at WSISTS57965; Jeffay Slide Nos. 199 and 200; Jeffay Tr. Day 1 at 160:4-17; PTX 89 at STS022506: ". . . the format the audio was originally received in;" Jeffay Slide No. 202; Jeffay Tr. Day 1 at 160:21-161:11; Moran Dep. Tr, April 13, 2007, at 28:20-25; Wright Dep. Tr. at 154:23–156:14.

**(b)** **The Filtering and Accepting Steps**

119.   Claims 3 and 13 both require filtering and accepting packets.

120.   The Nortel IP phone creates a stream of packets to transmit directly to NCR, and thus the Nortel IP phone determines which packets arrive at the NCR NIC and are subsequently passed through the CSCM operating system.

121.   STS/NICE alleges that NCR meets the "filtering" and "accepting" steps because its operating system (*i.e.,* Linux)  matches packet destination address and port number with those of the recorder itself.  These functions are inherent in operating systems such as Linux, and Witness did not alter or customize any operating system in any way to facilitate the alleged "filtering" and "accepting" of data packets.  (Tr. at 981:19-982:6, 982:21-983:2 (Dr. Williams).)

122.   As noted in paragraph 120, Witness designed NCR, as an active recorder, with the intention that the Communication Nortel IP phones, will not send any packets to the recorders that are not intended for recording.  (Tr. at 983:3-21 (Dr. Williams).)

123.   Consequently, the Nortel recorder, when used as intended, only acquires packets that are directly addressed to it and has no need for the alleged

44

"filtering" and "accepting" operations (*i.e.,* making a keep or discard decision). (Tr. at 983:3-21 (Dr. Williams).)

124.   STS/NICE's case-in-chief identifies no specific NCR operations as meeting the "filtering" and "accepting" steps.  Instead, Dr. Jeffay only testified that since NCR receives packets directly addressed to it, a filtering operation must be performed because "the recorder will need to do filtering to remove the packets that it's not interested in."  Dr. Jeffay's explanation presumes that "filtering" occurs, but does not establish that any "filtering" is performed in the required sequence of steps for any asserted claim, all of which require "filtering" to occur after "receiving" and before "analyzing."  (Tr. at 161:17-23 (Dr. Jeffay); Tr. at 983:13-21 (Dr. Williams).)

### (c)   The Analyzing Step

125.   Claims 3 and 13 require "analyzing the data within the accepted data packets to determine the telephone communication session to which the data packets belong."

126.   STS/NICE asserts that the NCR recorder analyzes data packets in a similar manner to the CSCM recorder by analyzing UDP port numbers to determine the communication session to which the data packets belong. (Wright Dep. Tr. at 154:23–156:22; Jeffay Slide No. 208; Jeffay Tr. Day 1 at

45

162:13-163:4.  *See also*,  PTX 89 at STS 022504; Jeffay Slide No. 209; Jeffay Tr. Day 1 at 163:5-12).

127.   Regarding the analyzing step for the NCR Recorder, the Court adopts its findings set out in paragraphs 107-113, hereof.

### (d)   **The Storing Step**

128.   Claims 3 and 13 require storing a portion of the communication session.

129.   Witness' NCR recorder stores portions of communication sessions as WAV files.  (PTX 20 at WSISTS054798 (diagram showing database storage at "Nortel Contact Recording Master); Jeffay Slide No. 213; Jeffay Tr. Day 1 at 163:24-164:4; PTX 89 at STS022506; Jeffay Slide No. 214; Jeffay Tr. Day 1 at 164:5-7).

130.   A [redacted] and a [redacted] function are used by Witness' source code for the NCR recorder to store communication sessions in a WAV file. (PTX 278 [redacted]; Jeffay Slide No. 216; Jeffay Tr. Day 1 at 164:8-15).

### B.   Claims 7, 8, 11, 12, 15, and 22

131.   Claims 7, 8, 11, and 12 depend from independent Claim 3, and Claims 15 and 22 depend from independent Claim 13.  The Court has reviewed

the elements of the dependent claims and finds that they are present in the

accused products for the reasons asserted by STS/NICE in their Proposed

Findings of Fact and Conclusions of Law.  However, because the Court has

found that not all of the elements of the independent claims are present in the

accused products, further analysis of the elements of the dependent claims is not

required to decide the issue of infringement.  Therefore, the Court will not

recount the specific analysis of the dependent claims.

## V.    <u>INVALIDITY</u>

132.    Witness contends that the following prior art references render the

claims of the `229 Patent invalid as anticipated:

a.    U.S. Patent No. 5,787,253 (the "`253 Patent" or "McCreery").

b.    D. Cohen, On Packet Speech Communications ("The 1981 Cohen
Paper") (DTX 136).

c.    U.S. Patent No. 4,914,586 (the "`586 Patent").

d.    P. Parnes, K. Synnes, and D. Schefstrom, mMOD: the multicast
Media-on-Demand system, at
http://www.cdt.luth.se/~peppar/progs/mMOD/WebNet97/mMOD.
pdf (May 1997) (the "Parnes Reference")

e.    Schulzrinne, Voice Communication Across the Internet: A
Network Voice Terminal, Tech. Rep., University of Massachusetts,
Amherest (MA), 1992 (the "NEVOT 1992" article).

f.    Schulzrinne, NEVOT Implementation and Program Structure,

47

Case 1:04-cv-02111-RWS   Document 372   Filed 05/23/08   Page 48 of 98

Tech. Rep., University of Massachusetts, Amherst (MA), 1996 (the "NEVOT 1996" article).

133.   In forming his opinion on invalidity, Mr. Casner failed to use the clear and convincing evidence standard.  Rather, he used the "more likely than not" standard.  (Casner Tr. Day 5 at 1106:17-1107:1-2).

134.   The Court will address each of the prior art references in turn. Because the Court concludes that Winess has failed to prove by clear and convincing evidence that any of the asserted claims are invalid for reasons of anticipation, the Court will limit its findings to elements of the claims not disclosed by the prior art.

### A.     The `253 Patent (McCreery)

135.   Witness failed to offer clear and convincing evidence or testimony that the operation of the steps purportedly described in the `253 Patent operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

136.   Mr. Casner did not provide any testimony that the operation of the steps purportedly described in the `253 Patent operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

48

AO 72A
(Rev.8/82)

137.   Witness failed to provide clear and convincing evidence that the `253 Patent discloses performing a method in connection to data packets relating to "communication sessions" as set forth in the asserted claims of the `229 Patent.  As construed by the Court, a "communication session" is "both a conversation, in which at least two parties converse by exchanging audio and/or video information in 'real time,' and a message, in which at least one party records such audio and/or video information for reception by at least one other party at a later date."  (D251 at 46).

138.   While Mr. Casner testified that the `253 Patent provided examples ("mostly TCP examples and HTTP") of particular types of communications sessions (*see* Casner Tr. Day 5 at 1082:18–22), Mr. Casner did not provide any testimony or cite to any disclosure in the `253 Patent showing that the data packets described in the `253 patent relate to a "communication session" as construed by the Court.  In fact, he conceded there is no such disclosure:

> Q.   You agree with me that McCreery does not expressly disclose conversations in which at least two parties converse by exchanging audio and/or video information in real-time?
>
> A.   That's correct.

(Casner Tr. Day 5 at 1112:6-9).

49

\* \* \* \* \* \*

> Q.     But you agree with me that McCreery does not expressly disclose a communication session as that term is used in the claims of the `229 patent; correct?

> A.     Yes.

(Casner Tr. Day 5 at 1113:18-21).

139.   In addition, Mr. Casner conceded that the `253 Patent does not disclose the RTP protocol or the recording of audio.

> Q.     And you'll agree with me that McCreery does not disclose the RTP protocol; is that correct?

> A.     That's correct.

(Casner Tr. Day 5 at 1112:10-12).

140.   Witness failed to offer clear and convincing evidence or testimony that the `253 Patent discloses claim steps 3(b) ("filtering each of the received data packets to accept the data packets that are associated with a session to be monitored") and 13(b) ("filtering the data packets using filtering information") of the `229 Patent.

141.   While Mr. Casner testified in direct examination that "McCreery states its own raw packet filter component 332" (*see* Casner Tr. Day 5 at 1090:18–22), Mr. Casner did not provide any testimony or identify any

50

supporting language in the `253 patent to show that the "raw packet filter component" filters packets "to accept the data packets that are associated with a [communication] session to be monitored" as set forth in claim step 3(b).

142.   Witness failed to offer clear and convincing evidence or testimony that the `253 Patent discloses claims steps 3(c) ("analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs") and 13(d) ("analyzing data within the accepted data packets to determine communication sessions to which the data packets belong") of the `229 Patent.

143.   Mr. Casner stated that "McCreery also analyzes the port numbers in the packet analyzer.  It can analyze whatever selected fields of the packet are desired." (*See* Casner Tr. Day 5 at 1090:23–1091:3.)  As discussed above, however, Mr. Casner did not provide any testimony or evidence showing that the packets discussed in the `253 Patent relate to a "communication session" as construed by the Court.

144.   Also, while Mr. Casner provided testimony that the `253 Patent discloses analyzing the port numbers in data packets, Mr. Casner provided no testimony that the `253 Patent discloses "analyzing data within the accepted

data packets to determine the communication sessions to which the data packets belong."(D251 at 45).

145.   Witness failed to offer clear and convincing evidence or testimony that the `253 Patent discloses claim 8 ("[t]he method of claim 3, wherein individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a session to be monitored") of the `229 Patent.

146.   With respect to claim 8, while Mr. Casner testified that "McCreery talks about a list of predetermined addresses stored in memory" (*see* Casner Tr. Day 5 at 1091:24–1092:5), Mr. Casner provided no testimony that the `253 Patent discloses that "individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a [communication] session to be monitored."  As discussed above, Mr. Casner did not provide any testimony or evidence showing that the packets discussed in the `253 Patent relate to a "communication session" as construed by the Court.

147.   Witness failed to offer clear and convincing evidence or testimony that the `253 Patent discloses claim 15 ("[t]he method of claim 13, including the additional step of including in a database information extracted from the accepted data packet including one or more from the group of a packet address,

52

a time, a date, a channel, a dialed number, and a caller identification") of the `229 Patent.

148.   While Mr. Casner testified that "McCreery extracts source address, destination address and time" (*see* Casner Tr. Day 5 at 1084:12-25), Mr. Casner did not provide any testimony showing that the `253 Patent discloses storing such extracted data in a database.

149.   Witness failed to offer clear and convincing evidence or testimony that the `253 Patent discloses claim 22 ("[t]he method of claim 20, wherein the outputting step further comprises the step of producing any audio data included in the organized data packets as sound through an earphone or a loudspeaker") of the `229 Patent.

150.   As discussed above, Mr. Casner did not provide any testimony or evidence showing that the packets discussed in the `253 Patent relate to a "communication session" as construed by the Court.  Mr. Casner also did not provide any testimony showing that the `253 Patent discloses "producing any audio data included in the organized data packets as sound through an earphone or a loudspeaker."  In fact, Mr. Casner conceded that "McCreery does not teach

specifically the use of loud speakers to play the call." (*See* Casner Tr. Day 5 at 1094:21–1095:2).

151.   Mr. Casner did not testify that claim 22 is anticipated by the `253 Patent.  (*See* Casner Tr. Day 5 at 1095:18–25).  Instead, Mr. Casner testified that "the VAT program," could have been used to "play the call with sound." (*See* Casner Tr. Day 5 at 1095:3–9).  However, Mr. Casner provided no testimony to show that "the VAT program" was incorporated by reference in the `253 Patent.

152.   The "VAT program" is not mentioned or discussed by the `253 Patent.

153.   Further, with respect to whether the `253 Patent inherently discloses claim 22, Mr. Casner did not provide any testimony showing that a person of ordinary skill in the art would have understood the `253 Patent to disclose necessarily using "the VAT program" to perform the method of claim 22 of the `229 Patent.  In fact, Mr. Casner did not provide any testimony on what level of skill a person of ordinary skill in the art would have.  (*See* Casner Tr. Day 5 at 1104:9–14).

54

**B.**     **The 1981 Cohen Paper**

154.   Witness failed to offer any evidence or testimony that the 1981 Cohen Paper was enabling such that a person of ordinary skill in the art could practice the invention without undue experimentation.

155.   While Dr. Cohen testified without any explanation that "if we went back through–step-by-step through the [NVP Specification (DTX133)], [that would] give us all of the fields that would give the background knowledge that one skilled in the art at this time had" (*see* Cohen Tr. Day 5 at 1159:24–1160:3), Dr. Cohen did not provide testimony on the level of skill of a person of ordinary skill in the art.

156.   Further, Dr. Cohen did not provide any testimony on whether the 1981 Cohen Paper contains sufficient disclosure such that that person of ordinary skill in the art would have been able to make and use the invention disclosed in the `229 Patent without undue experimentation.  He offered no testimony whatsoever concerning undue experimentation.

157.   Witness failed to offer clear and convincing evidence or testimony that the operation of the steps purportedly described in the 1981 Cohen Paper operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

158.   Dr. Cohen did not provide any testimony to show that the operation of the steps purportedly described in the 1981 Cohen Paper is in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

159.   Witness Systems failed to provide clear and convincing evidence that the 1981 Cohen Paper Patent discloses performing a method in connection to data packets relating to a "communication session" as set forth in the asserted claims of the `229 Patent.

160.   As construed by the Court, a "communication session" means "both a conversation, in which at least two parties converse by exchanging audio and/or video information in 'real time,' and a message, in which at least one party records such audio and/or video information for reception by at least one other party at a later date."  (D251 at 46).

161.   Dr. Cohen testified that the 1981 Cohen Paper discloses only a voicemail system similar to an answering machine.  (Cohen Tr. Day 5 at 11152:9-11, 11158:9-14).  Dr. Jeffay testified that there is a difference between the claimed "communication sessions"  of the `229 patent and voice mail systems.  (Jeffay Tr. Day 5 at 1253:10-12).

162.   Witness failed to offer clear and convincing evidence or testimony that the 1981 Cohen Paper discloses claim steps 3(b) ("filtering each of the

56

received data packets to accept the data packets that are associated with a session to be monitored") and 13(b) ("filtering the data packets using filtering information") of the `229 Patent.

163.   At trial, Dr. Cohen was asked: "Now, in the Filtering and Accepting steps, we're talking about NICE's allegation of the operating system discarding invalid packets.  What does the VMS do?"  (*See* Cohen Tr. Day 5 at 1140:6–8.)  In response, Dr. Cohen testified, "Exactly the same." (*See* Cohen Tr. Day 5 at 1140:9.)  Dr. Cohen further testified that, "The system checks the packet.  If the packet is admissible, it was accepted.  Otherwise, rejected."  (*See* Cohen Tr. Day 5 at 1140:21–22.)  However, in his testimony, Dr. Cohen did not identify any language in the 1981 Cohen Paper to support his testimony.

164.   While the demonstrative shown by Witness in connection with Dr. Cohen's testimony about claim steps 3(b) and 13(b) included an excerpt from a document described by Witness as the "NVP Specification" (DTX 133), Dr. Cohen did not provide any testimony to show that a person of ordinary skill in the art at the time the application leading to the `229 Patent was filed would have understood the disclosure in the NVP Specification to have been incorporated by reference or inherently disclosed in the 1981 Cohen Paper.

165.   There is no specific incorporation by reference of the NVP Specification in the 1981 Cohen Paper.

166.   Witness failed to offer clear and convincing evidence or testimony that the 1981 Cohen Paper discloses claims steps 3(c) ("analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs") and 13(d) ("analyzing data within the accepted data packets to determine communication sessions to which the data packets belong") of the `229 Patent.

167.   While Dr. Cohen testified that "the LINK field in the - in the header did exactly what the PORT field did in the UDP whenever UDP was introduced" (*see* Cohen Tr. Day 5 at 1141:21–1142:7), Dr. Cohen did not provide any evidence or identify any language in the 1981 Cohen Paper to support his testimony.  Dr. Cohen also did not explain how his testimony shows that the 1981 Cohen Paper discloses the "analyzing" step of claims 3 and 13. Specifically, Dr. Cohen did not provide any testimony to show that the 1981 Cohen Paper discloses "analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs."

168.   In addition, the "link number" identified on the demonstrative used by Witness in connection with Dr. Cohen's testimony on claim steps 3(c) and 13(d) is not part of the 1981 Cohen Paper and is language added from an excerpt of the NVP Specification (DTX 133).  Dr. Cohen did not provide any testimony to show that a person of ordinary skill in the art would have understood the disclosure of the NVP Specification to have been specifically incorporated by reference or inherently disclosed in the 1981 Cohen Paper.

169.   Moreover, the language cited by Dr. Cohen from the NVP Specification was not specifically incorporated into the 1981 Cohen Paper.

170.   Witness failed to offer clear and convincing evidence or testimony that the 1981 Cohen Paper discloses claim 7 ("[t]he method of claim 3 wherein the session to be monitored has a packet address which is one of an IP address of the packet source and the IP address of the packet destination") of the `229 Patent.

171.   Dr. Cohen did not provide any testimony or identify any evidence at trial showing that the 1981 Cohen Paper discloses the method of claim 7. Instead, Dr. Cohen testified about the NVP-II Specification (DTX 139) in connection with claim 7.  (*See* Cohen Tr. Day 5 at  1148:21–1149:1).

AO 72A
(Rev.8/82)

172.   Dr. Cohen conceded that the 1981 Cohen Paper does not disclose the use of an IP address:

> Q.      The Defendant's Exhibit 137, which is the 1981 Cohen Paper, does not expressly disclose the use of IP; correct?
>
> A.      IP -- IP was created after 1981 and, therefore, it is not -- it's not talked about by the 1-8 -- by the '81 paper.

(Cohen Tr. Day 5 at 1153:3-7).

173.   Witness asserted that it was relying on the NVP-II Specification only for claim 7 of the `229 Patent (*see* Trial Tr. Day 5 at 1148:21–22), and that it was not relying on the NVP–II Specification for obviousness.  (*See* Trial Tr. Day 5 at 1149:6–7).  However, Dr. Cohen did not provide any testimony or evidence showing that a person of ordinary skill in the art would have understood the NVP-II Specification to be disclosed expressly or inherently in the 1981 Cohen Paper.

174.   Dr. Cohen also did not provide any testimony or evidence showing that a person of ordinary skill in the art would have understood the NVP-II Specification to be incorporated by reference in the 1981 Cohen Paper.

175.   Further, Dr. Cohen did not provide any testimony on whether the NVP-II Specification contains sufficient disclosure such that that person of

60

ordinary skill in the art would have been able to make and use the invention disclosed in the `229 Patent without undue experimentation.

176.   Claim 7 depends from claim 3 of the `229 Patent.  Because Dr. Cohen did not provide any testimony with respect to the elements of claim 3 in connection with the NVP-II Specification, Dr. Cohen did not provide clear and convincing testimony to show that the NVP-II Specification anticipates claim 7.

177.   In addition, while Dr. Cohen testified that "the NVP-II version of [his] system used" IP addressing (*see* Cohen Tr. Day 5 at 1148:23–1149:1), Dr. Cohen did not provide any testimony that the 1981 Cohen Paper or the NVP-II Specification disclosed the invention disclosed in claim 7 of the `229 Patent. Also, the "NVP-II version of [his] system" was not disclosed in either the 1981 Cohen Paper or the NVP-II Specification.

### C.   The `586 Patent

178.   Witness failed to offer clear and convincing evidence or testimony that the operation of the steps purportedly described in the `586 Patent operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.  Dr. Clark did not provide any testimony that the operation of the steps

purportedly described in the `586 Patent operated in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

179.   Witness failed to offer clear and convincing evidence or testimony that the `586 Patent discloses claims steps 3(c) ("analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs") and 13(d) ("analyzing data within the accepted data packets to determine communication sessions to which the data packets belong") of the `229 Patent.

180.   While Dr. Clark testified that "the analyzing in this step would be done using the . . . PUP address and the PUP port" (*see* Clark Tr. Day 5 at 1169:14–1170:3), Dr. Clark did not identify any evidence to show that the `586 Patent expressly discloses performing the "analyzing" of claim steps 3(c) and 13(d) by using the PUP address and the PUP port.

181.   Further, Dr. Clark did not provide any evidence to show that a person of ordinary skill in the art would have understood the `586 patent to disclose necessarily using the "PUP address and the PUP port" to perform the step of "analyzing data within the accepted data packets to determine communication sessions to which the data packets belong."

182.   Witness failed to offer clear and convincing evidence or testimony that the `586 Patent discloses claim 7 ("[t]he method of claim 3 wherein the session to be monitored has a packet address which is one of an IP address of the packet source and the IP address of the packet destination") of the `229 Patent.

183.   Dr. Clark testified that "[t]he etherphone system as described in 1983 does not run on Ethernet – does not run on Internet protocols [IP]."  (*See* Clark Tr. Day 5 at  5b, 1170:23–25).

184.   While Dr. Clark agreed that "somebody at the time would have understood that the system could be built with IP" (*see* Clark Tr. Day 5 at 1171:5–8), Dr. Clark provided no testimony showing that a person of ordinary skill in the art would have understood the system described in `586 Patent to necessarily perform the method of claim 7.

185.   The demonstrative used by Witness in connection with Dr. Clark's testimony includes an excerpt from a document referred to by Witness as the "PUP Report" (DTX 110), and does not include any support from the `586 Patent.  While Dr. Clark testified that the excerpt is "a reference cited by the Globecom Paper" (*see* Clark Tr. Day 5 at 1171:1–2), Dr. Clark did not provide any testimony or evidence to show that the excerpt from the PUP Report was

specifically incorporated by reference or otherwise disclosed in the `586 Patent itself.  Dr. Clark also conceded that the "PUP Report" (DTX 110) does not disclose use of an IP address.  (Clark Tr. Day 5 at 1190:8-16).

186.   Witness failed to offer clear and convincing evidence or testimony that the `586 Patent discloses claim 8 ("[t]he method of claim 3, wherein individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a session to be monitored") of the `229 Patent.

187.   While Dr. Clark testified that the system disclosed by the `586 patent "accept[s] based on address" (*see* Clark Tr. Day 5 at 1171:13–19), Dr. Clark did not provide any testimony as to whether "individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a session to be monitored" as set forth in claim 8 of the `229 Patent.  (Clark Tr. Day 5 at 1190:17-1191:2).

188.   Witness failed to offer clear and convincing evidence or testimony that the `586 Patent discloses claim 15 ("[t]he method of claim 13, including the additional step of including in a database information extracted from the accepted data packet including one or more from the group of a packet address,

64

a time, a date, a channel, a dialed number, and a caller identification") of the `229 Patent.

189.   While Dr. Clark testified that "the Etherphone system actually had a fairly sophisticated database to describe the data files" and "caller identification is one of the elements" (*see* Clark Tr. Day 5 at 1174:18–1175:14), Dr. Clark did not provide any testimony or evidence showing that the `586 Patent discloses extracting caller identification information, or any type of information, from an accepted data packet and storing that information in a database.

### D.   **The Parnes Reference**

190.   Witness failed to show that the Parnes Reference constitutes a printed publication under 35 U.S.C. § 102 (a) and/or (b).  While Witness asserted that it was relying on the Parnes Reference as a prior art without undue experimentation printed publication ("[w]e are relying on the written documents" (*see* Clark Tr. Day 5 at 1051:25)), Witness failed to offer any evidence or testimony showing that the Parnes Reference was publicly available prior to the filing date of the application leading to the `229 Patent.

191.   While Dr. Clark testified about the Parnes Reference (*see*, *e.g.*, Clark Tr. Day 5 at 1166:4–12), Dr. Clark did not provide any testimony on

whether the Parnes Reference was publicly available to the public interested in the art. Nor did Witness offer testimony from any other witness to show that the Parnes Reference was publicly available.

192.   The Parnes Reference contains no indication or reference to a journal, book, etc. which would indicate it had been published.

193.   Witness failed to offer any evidence or testimony that the Parnes Reference was enabling such that a person of ordinary skill in the art could practice the invention set forth in the asserted claims of the `229 Patent.

194.   Dr. Clark did not provide an opinion at trial on what level of skill a person of ordinary skill in the art would have.

195.   Dr. Clark also did not provide clear and convincing testimony that the Parnes Reference provides sufficient disclosure such that a person of ordinary skill in the art in August 1998, the priority date of the `229 Patent, would have been able to make and use the claimed invention without undue experimentation.

196.   Witness failed to offer clear and convincing evidence or testimony that the operation of the steps purportedly described in the Parnes Reference operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

197.   Dr. Clark did not provide any testimony showing that that the operation of the steps purportedly described in the Parnes Reference operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

198.   Witness failed to offer clear and convincing evidence or testimony that the Parnes Reference discloses claim 8 ("[t]he method of claim 3, wherein individual data packets are accepted by the filtering step if such data packets have an address which is associated in a database with a session to be monitored") of the `229 Patent.

199.   Dr. Clark did not provide any testimony or evidence showing that the Parnes Reference discloses a database containing IP addresses for communication sessions to be monitored or filtering IP packets based on the addresses in such a database.  (Wessler Tr. Day 5 at 1208:10-20, 1209:14-25).

200.   Dr. Clark testified that the Parnes Reference discloses a "rich base of plural -- plurality of connections" and that "you can run many VCRs on the same machine . . . you could have many things going on, not only in a plurality, but concurrently."  (*See* Clark Tr. Day 5 at 1172:5–18).  However, with respect to whether the Parnes Reference expressly or inherently discloses claim 11, Dr. Clark stated that the "[t]he authors [of the Parnes Reference] do not say . . . we can record -- we can run lots of VCRs on one machine. And, so, the question is:

. . . is it simply the case that they took the idea of multiple VCRs on one machine as something everybody understood?" (*See* Clark Tr. Day 5 at 1195:12–1198:1).  Admitting that his analysis was "tangled" and that "this is a complicated space," Dr. Clark opined that the Parnes reference, "combined with what anybody would understand about Unix at the time, would draw [the] conclusion" that "you can have multiple VCRs running on one machine."  (See Clark Tr. Day 5 at 1196:20, 1197:2, 20-24).

201.   Further, Dr. Wessler testified that the Parnes Reference does not expressly disclose the additional limitation of claim 11 of the `229 Patent because "there is no description in the paper of a machine that's running a plurality of VCRs."  (*See* Wessler Tr. Day 5 at 1210:23–1211:8

202.   Based on this record, Witness failed to offer clear and convincing evidence or testimony that the Parnes Reference discloses claim 11 ("[t]he method of claim 3 wherein the receiving step further comprises receiving data packets from a plurality of communication sessions") of the `229 Patent.

**E.**   **NEVOT 1992 and 1996**

203.   Witness failed to show that either the NEVOT 1992 article or NEVOT 1996 article constitutes a printed publication under 35 U.S.C. § 102 (a) and/or (b).  Witness asserted that it was relying on NEVOT 1992 and NEVOT

1996 as prior art printed publications ("[w]e are relying on the written documents" (Trial Tr. Day 5 at 1051:25)), however, Witness failed to offer any evidence or testimony showing that these documents were publicly available prior to the priority date of of `229 Patent.

204.   Neither the NEVOT 1992 nor the NEVOT 1996 documents contain any indication or reference to a journal, book, etc. which would indicate either had been published.

205.   Witness failed to offer any evidence or testimony that the NEVOT 1992 or 1996 was enabling such that a person of ordinary skill in the art could practice the invention set forth in the asserted claims of the `229 Patent without undue experimentation, as required for anticipatory prior art.  (Casner Tr. Day 5 at 1099:2-5).

206.   Mr. Casner did not provide an opinion at trial on what level of skill a person of ordinary skill in the art would have.  (*See* Casner Tr. Day 5 at 1104:9–14.).

207.   While Mr. Casner testified that "the type of people with whom [he] worked [in] '92 . . . could have read the disclosure and actually practiced the material set forth in [the] article[]" (*see* Casner Tr. Day 5 at 1097:19–24), Mr. Casner did not provide any testimony at trial on whether or not NEVOT 1992

contains sufficient disclosure such that a person of ordinary skill in the art would have been able to make and use the invention disclosed in the `229 Patent without undue experimentation.

208.   Witness failed to offer clear and convincing evidence or testimony that the operation of the steps purportedly described in NEVOT 1992 and 1996 operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

209.   Mr. Casner did not provide any testimony that the operation of the steps purportedly described in NEVOT 1992 and 1996 operate in accordance with the order of steps recited in claims 3 and 13 of the `229 Patent.

210.   Witness failed to offer clear and convincing evidence or testimony that NEVOT 1992 or 1996 discloses claim steps 3(b) ("filtering each of the received data packets to accept the data packets that are associated with a session to be monitored") and 13(b) ("filtering the data packets using filtering information") of the `229 Patent.

211.   Mr. Casner testified in direct examination that "the operating system [in NEVOT] provides . . . filtering based on the address." (*See* Casner Tr. Day 5 at 1072:1–5).  However, Mr. Casner did not identify any language in NEVOT 1992 or 1996 to support this testimony.

212.   Witness failed to offer clear and convincing evidence or testimony that NEVOT 1992 or 1996 discloses claims steps 3(c) ("analyzing the data within the accepted data packets to determine a communication session to which each accepted data packet belongs") and 13(d) ("analyzing data within the accepted data packets to determine communication sessions to which the data packets belong") of the `229 Patent.

213.   While Mr. Casner testified that "NEVOT" analyzes data packets by examining UDP port number "through the UDP implementation and the operating system" (*see* Casner Tr. Day 5 at 1072:21–1071:1), Mr. Casner did not identify any language in NEVOT 1992 or 1996 to support his testimony.

214.   Moreover, by this same testimony, Mr. Casner failed to show that NEVOT 1992 or 1996 discloses "analyzing data within the accepted data packets to determine the communication sessions to which the data packets belong." He responded only to an inquiry concerning "the operating system analyz[ing] the data packets by examining port number." (Casner Tr. Day 5 at 1072:21-1073:1; D251 at 45).

215.   Witness failed to offer clear and convincing evidence or testimony that NEVOT 1992 or 1996 discloses claim 8 ("[t]he method of claim 3, wherein individual data packets are accepted by the filtering step if such data packets

71

have an address which is associated in a database with a session to be

monitored") of the `229 Patent.

216.   With respect to claim 8, while Mr. Casner testified that NEVOT

makes "use of the same database, that is, the same data structure in the

operating system to establish the set of ports to be matched to incoming

packets" (*see* Casner Tr. Day 5 at 1075:15–22), Mr. Casner did not identify any

language in NEVOT 1992 to support his testimony about the purported

database.

217.   Also, in his testimony relating to claim 8, Mr. Casner cited to

language in NEVOT 1992 relating to UDP port numbers, which as discussed

above, he had previously testified showed "analyzing" not "filtering."  (Claim 8

refers back to "filtering" not "analyzing).  Thus, Mr. Casner did not provide any

testimony to explain how the disclosure of UDP port numbers relates to the

"filtering" step 3(b) as required by claim 8 ("[t]he method of claim 3, wherein

individual data packets are accepted by the filtering step if such data packets

have an address which is associated in a database with a session to be

monitored").

## VI.   CONCLUSIONS OF LAW

### A.   Jurisdiction

218.   This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331

and 1338(a), as this is an action arising under the Patent Act, 35

U.S.C. §§ 271 et seq.

219.   Witness maintains an office, and has sold and offered for sale in

this judicial district the products that STS/NICE allege infringe the `229 patent.

Accordingly, the Court has personal jurisdiction over Witness.

220.   Venue in this Court is proper pursuant to 28 U.S.C. § 1400.

### B.   Infringement

221.   Under the Patent Act, direct infringement occurs when a party

"without authority makes, uses, offers to sell, or sells any patented invention,

within the United States or imports into the United States any patented

invention during the term of the patent . . . ."  35 U.S.C. § 271(a).

222.   Infringement analysis requires two steps:  (1) claim construction to

determine the scope and meaning of the asserted claims, and (2) a comparison

of the properly construed claims with the allegedly infringing method to

determine whether the method practices every limitation of the claims.  Cybor

Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454, 1467 (Fed. Cir. 1998) (en banc).

223.   To prevail in a patent infringement suit, the patent owner must prove by a preponderance of the evidence that all elements or limitations of the claims, as construed by the court, are present in the accused product. Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1311 (Fed. Cir. 2005).

224.   The Federal Circuit has held that "[i]nfringement of process inventions is subject to the 'all-elements rule' whereby each of the claimed steps of a patented process must be performed in an infringing process . . . ." Canton Bio-Med., Inc. v. Integrated Liner Techs., Inc.,  216 F.3d 1367, 1370 (Fed. Cir. 2000).

225.   A defendant can directly infringe a patent under the doctrine of equivalents.  "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 733 (2002).

226.   Infringement is found under the doctrine of equivalents where every limitation of the asserted claim or its equivalent is found in the accused

74

subject matter and where the equivalent differs from the claimed limitation only

insubstantially.  Abraxis Bioscience, Inc. v. Mayne Pharma (USA), Inc., 467

F.3d 1370, 1379 (Fed. Cir. 2006); *see also* Graver Tank & Mfg. Co. v. Linde

Air Prods. Co., 339 U.S. 605, 608 (1950), superseded on other grounds by

statute, 35 U.S.C. § 112.  The equivalence analysis focuses on whether the

element in the accused method "performs substantially the same function in

substantially the same way to obtain the same result" as the claim limitation.

Graver Tank & Mfg., 339 U.S. at 608.

227.   Equivalency must be determined against the context of the patent,

the prior art, and the particular circumstances of the case.  Id. at 609.

"Equivalence, in the patent law, is not the prisoner of a formula and is not an

absolute to be considered in a vacuum."  Id.  An important factor is whether

persons reasonably skilled in the art would have known of the

interchangeability of an ingredient not contained in the patent with one that

was.  Id.

228.   "Prosecution history estoppel prevents a patentee from recapturing

under the doctrine of equivalents subject matter surrendered during prosecution

to obtain a patent."  Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,

480 F.3d 1335, 1341 (Fed. Cir. 2007).  Thus, "a narrowing amendment made to

satisfy any requirement of the Patent Act may give rise to an estoppel."  Festo Corp., 535 U.S. at 736.  "A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim."  Id. at 740.

229.   The presumption of surrender, however, "may be rebutted if the patentee can demonstrate that:  (1) the alleged equivalent would have been unforeseeable at the time . . . the narrowing amendment was made; (2) the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent at issue; or (3) there was some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent." Honeywell Int'l Inc. v. Hamilton Sundstrand Corp., 370 F.3d 1131, 1140 (Fed. Cir. 2004) (quotations omitted).

230.   "Whoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).

231.   Inducement of infringement can be found where there is an underlying instance of direct infringement and a requisite showing of intent. Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1377 (Fed. Cir. 2005).

232.   The requisite showing of intent is a "showing that the alleged infringer's actions induced infringing acts and that he knew or should have

known his actions would induce actual infringements." <u>DSU Med. Corp. v. JMS Co.</u>, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (en banc) (citation omitted). "The intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. . . .  Inducement 'requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.'" <u>epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.</u>, 492 F. Supp. 2d 608, 615-16 (E.D. Tex. 2007) (quoting DSU, 471 F.3d at 1306).

233.   One who "offers to sell or sells within the United States . . . a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer."  35 U.S.C. § 271(c).

234.   After a direct infringement has been shown, contributory infringement can be shown where (1) defendant supplied an important component of the infringing part of the method, (2) the component is not a staple article of commerce suitable for non-infringing use, and (3) defendant supplied the component with knowledge of the patent-in-suit and knowledge

that the component was especially made or adapted for use in an infringing

manner.  Lummus Indus., Inc. v. D.M. & E. Corp., 862 F.2d 267, 272 (Fed. Cir.

1988).

     235.   For the reasons stated above, the Court concludes that STS/NICE

has not proven, by a preponderance of the evidence, that Witness Systems,

Witness Systems' customers, or anyone else performs, through use of CSIP,

CSCM or NCR, all elements of any of the asserted claims 7, 8, 11, 12, 15, and

22 of the `229 patent.  Accordingly, the Court concludes that Witness Systems

does not directly infringe any of the asserted claims of the `229 patent.

Furthermore, the Court concludes that Witness Systems does not indirectly

infringe any of the asserted claims of the `229 patent, either by actively

inducing or contributing to another's direct infringement.

     236.   For the reasons set forth in paragraphs 85-88, 100-104, and 119-

124,  STS/NICE has not shown that Witness, Witness' customers, or anyone

else performs, through use of CSIP, CSCM or NCR, the "filtering" and

"accepting" steps of claims 3 and 13.  Because all of the asserted claims depend

from claims 3 and 13, the Court separately concludes that the Witness Systems

does not infringe, either directly or indirectly, the asserted claims of the `229

patent.

237.   For the reasons set forth in Findings of Fact Nos. 105-113, 125-127, STS/NICE has not shown that Witness, Witness' customers, or anyone else performs, through use of CSCM or NCR, the "analyzing" step of claims 3 and 13.  Because all of the asserted claims depend from claims 3 and 13, the Court separately concludes that Witness does not infringe, directly or indirectly, any of the asserted claims of the `229 patent, through use of CSCM or NCR.

### C.   **Anticipation**

238.   An issued patent is presumed to be valid.  35 U.S.C. § 282; *see also* Hughes Tool Co. v. Dresser Indus., Inc., 816 F.2d 1549, 1555 (Fed. Cir. 1987); N. Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 935 (Fed. Cir. 1990) ("the grant of the patent by the PTO carries with it the presumption of validity"); Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co., 730 F.2d 1452, 1459 (Fed. Cir. 1984).

239.   "[A] party seeking to invalidate a patent must do so by clear and convincing evidence."  Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1326 (Fed. Cir. 2004).  The burden of proving invalidity by clear and convincing evidence always remains with the party challenging the patent.  *See* Am. Hoist & Derrick Co. v. Sowa and Sons, Inc., 725 F.2d 1350, 1358 (Fed. Cir. 1984).

AO 72A
(Rev.8/82)

240.   Clear and convincing evidence is evidence that places in the fact finder "an abiding conviction that the truth of [the] factual contentions are [sic] 'highly probable.'"  Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 830 (Fed. Cir. 1991) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)).

241.   "[I]nvalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000).

242.   "The identical invention must be shown in as complete detail as is contained in the patent claim."  Richardson v. Suzuki Motor Co. Ltd., 868 F.2d 1226, 1236 (Fed. Cir. 1989).  The party asserting invalidity by anticipation is "required to prove by clear and convincing evidence that each and every element of the claimed invention was described in [the prior art reference]." Zenon Envtl, Inc. v. U.S. Filter Corp., 506 F.3d 1370, 1379 (Fed. Cir. 2007).

243.   "Material not explicitly contained in a single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document." Advanced Display, 212 F.3d at 1282.  "To incorporate material by reference, the host document must identify

80

with detailed particularity what specific material it incorporates and clearly

indicate where that material is found in the various documents." Id.; *see also*

Zenon Envtl., 506 F.3d at 1378-80 (finding that patents failed to incorporate

material with sufficient particularity to one reasonably skilled in the art).

244.   "[I]f an element is not expressly disclosed in a prior art reference,

the reference will still be deemed to anticipate a subsequent claim if the missing

element 'is necessarily present in the thing described in the reference, and that it

would be so recognized by persons of ordinary skill.'" Rosco, Inc. v. Mirror

Lite Co., 304 F.3d 1373, 1380 (Fed. Cir. 2002) (quoting Cont'l Can Co. v.

Monsanto Co., 948 F.2d 1264, 1268 (Fed.Cir.1991)).

245.   However, as set forth by the Federal Circuit :

> Although we have permitted the use of additional
> references to confirm the contents of the allegedly
> anticipating reference, we have made clear that
> anticipation does not permit an additional reference to
> supply a missing claim limitation. [The defendant's]
> argument [improperly] attempts to combine the
> teachings of the references to build an anticipation.

Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1335 (Fed. Cir. 2002)

(internal citations omitted); *see also* Cont'l Can Co., 948 F.2d at 1269 ( The

doctrine of inherent anticipation "is not . . . a substitute for determination of

patentability in terms of § 103 [obviousness].").

81

246.   Further, "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient [for proving inherent anticipation]." Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365, 1376 (Fed. Cir. 2001) (citations omitted) ; Electro Med. Sys., S.A. v. Cooper Life Sci., Inc., 34 F.3d 1048, 1052 (Fed. Cir. 1994) (same).  "Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art." Rosco, 304 F.3d at 1380; Transclean Corp. v. Bridgewood Serv., Inc., 290 F.3d 1364, 1373-74 (Fed. Cir. 2002) (holding that a patent describing an apparatus that in operation would include a claim limitation in some instances, but not in all instances, could not inherently anticipate); Atofina v. Great Lakes Chem. Corp., 441 F.3d 991, 1000 (Fed. Cir. 2006) (finding that the asserted prior art did not anticipate claims involving catalysts because it said nothing about contact time, and "anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation.").

247.   In order to anticipate, a prior art disclosure must also be sufficiently enabling such that one of ordinary skill in the art could make and use the disclosed invention without undue experimentation.  *See* Minnesota Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1306 (Fed. Cir. 2002).  In

82

addition, with respect to non-patent prior art, the party asserting invalidity bears the burden of showing that the reference is enabling. *See* <u>Aspex Eyewear, Inc. v. Concepts in Optics, Inc.</u>, 111 F. App'x 582, 589 (Fed. Cir. 2004) ("Since the [reference] was not embodied in a prior art patent, *cf.* <u>Amgen Inc. v. Hoechst Marion Roussel, Inc.</u>, 314 F.3d 1313, 1355 (Fed. Cir. 2003), the burden to show enablement rested on [the defendant].").

248.   Under both 35 U.S.C. §102 (a) and (b), a printed publication must be publicly accessible. *See* <u>Carella v. Starlight Archery & Pro Line Co.</u>, 804 F.2d 135, 139 (Fed. Cir. 1986) (declining to find anticipation by prior publication under 35 U.S.C. § 102(a) where the proponent failed to present any evidence that the prior art had been received by the public before the filing date).

249.   Also, as recently set forth by the Federal Circuit:

> Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication' bar under 35 U.S.C. § 102(b). A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it. The

decision whether a particular reference is a printed publication must
be approached on a case-by-case basis.

<u>SRI Int'l, Inc. v. Internet Security Sys., Inc.</u>, 511 F.3d 1186, 1194–95 (Fed. Cir.

2008) (internal citations omitted).

250.   The party asserting invalidity bears the burden of showing that

prior art constitutes a publicly available reference.  *See* <u>Carella</u>, 804 F.2d at 139;

*see also* <u>N. Telecom, Inc. v. Datapoint Corp.</u>, 908 F.2d 931, 936-937 (Fed. Cir.

1990) (affirming a finding of no anticipation absent clear and convincing

evidence that the prior art reference was publicly available).

251.   An invention is in "public use" when it has been in use by a person

other than the inventor who is under no obligation of secrecy or confidentiality

to the inventor.  *See* <u>Minnesota Mining & Mfg.</u>, 303 F.3d at 1301.  Prior

knowledge or use is accessible to the public only if there has been no deliberate

attempt to keep it secret.  *See*, *e.g.*, <u>W. L. Gore & Assoc. v. Garlock, Inc.</u>, 721

F.2d 1540, 1550 (Fed. Cir. 1983).

252.   Also, an invention is not in "public use" if the prior art product was

sold by one other than the patentee, but the process of making the invention

remained unknown.  *See* <u>Torpharm, Inc. v. Ranbaxy Pharms. Inc.</u>, 336 F.3d

1322, 1328 (Fed. Cir. 2003).

AO 72A
(Rev.8/82)

253.   A claimed invention is considered to be "on-sale" under 35 U.S.C. § 102(b) if the invention is sold or offered for sale more than one year before the filing date of the patent application.  *See* Plumtree Software, Inc. v. Datamize, LLC, 473 F.3d 1152, 1160 (Fed. Cir. 2006).  Moreover, the "on-sale" bar of 35 U.S.C. § 102(b) requires that "the product must be the subject of a commercial [sale or] offer for sale." Pfaff v. Well Elecs., Inc., 525 U.S. 55, 67 (1998).

254.   In addition, where a product is sold by a third party and the details of an inventive process are not ascertainable from the product, then it is not a public use and will not bar a patent.  *See* W.L. Gore & Assoc., 721 F.2d at 1550; *see also* Miller Prods. Co. v. Veltek Assoc., No. 01-35-KAJ, 2004 WL 253473, at *4 (D. Del. Feb. 10, 2004) (holding that where there was no evidence that the public could learn the claimed process by examining the products, the on-sale bar of 35 U.S.C. § 102(b) did not apply).

### (1)   The `253 Patent (McCreery)

255.   As set forth in paragraphs 135-136, Witness failed to show clear and convincing evidence that the `253 Patent discloses the operation of steps as set forth in claims 3 and 13 of the `229 Patent, and thus failed to show that the

`253 Patent discloses each and every element of the asserted claims of the `229 Patent.

256.   As set forth in paragraphs 137-139, Witness failed to show by clear and convincing evidence that the `253 Patent discloses performing a method in connection to data packets relating to "communication sessions" as set forth in the asserted claims of the `229 Patent, and thus failed to show that the `253 Patent discloses each and every element of the asserted claims of the `229 Patent

257.   As set forth in paragraphs 140-141, Witness failed to show by clear and convincing evidence that the `253 Patent discloses the "filtering" steps of claims 3 and 13 of the `229 Patent, and thus failed to show that the `253 Patent discloses each and every element of the asserted claims of the `229 Patent.

258.   As set forth in paragraphs 142-144, Witness failed to show by clear and convincing evidence that the `253 Patent discloses the "analyzing" steps of claims 3 and 13 of the `229 Patent, and thus failed to show that the `253 Patent discloses each and every element of the asserted claims of the `229 Patent.

259.   As set forth in paragraphs 145-146, Witness failed to show by clear and convincing evidence that the `253 Patent discloses claim 8 of the `229 Patent, and thus failed to show that the `253 Patent discloses each and every element of the asserted claims of the `229 Patent.

260.   As set forth in paragraphs 147-148, Witness failed to show by clear and convincing evidence that the `253 Patent discloses claim 15 of the `229 Patent, and thus failed to show that the `253 Patent discloses each and every element of the asserted claims of the `229 Patent.

261.   As set forth in paragraphs 149-153, Witness failed to show by clear and convincing  evidence that the `253 Patent discloses claim 22 of the `229 Patent, and thus failed to show that the `253 Patent discloses each and every element of the asserted claims of the `229 Patent.

### (2)   The 1981 Cohen Paper

262.   To prove that any non-patent prior art reference was enabled as required before a prior art reference can anticipate any of the claims of the `229 Patent, Witness was required to provide testimony and evidence on the level of a person of ordinary skill in the art.  None of Witness' experts provided such testimony.  In addition, to show that a non-patent prior art reference is enabling, there must be evidence that one of ordinary skill in the art could make and use

AO 72A
(Rev.8/82)

the disclosed invention without undue experimentation.  None of Witness'

experts provided any testimony or evidence relating to "undue

experimentation".

263.   As set forth in paragraphs 154-156, Witness failed to show any

evidence that the 1981 Cohen Paper is sufficiently enabling such that a person

of ordinary skill in the art would have been able to make and use the invention

claimed in the `229 Patent without undue experimentation at the time the

application leading to the `229 Patent was filed, as required for proving

anticipation under 35 U.SC. § 102.

264.   As set forth in paragraphs 157-158, Witness failed to show by clear

and convincing evidence that the 1981 Cohen Paper discloses the operation of

steps as set forth in claims 3 and 13 of the `229 Patent, and thus failed to show

that the 1981 Cohen Paper discloses each and every element of the asserted

claims of the `229 Patent.

265.   As set forth in paragraphs 149-161, Witness failed to show by clear

and convincing evidence that the 1981 Cohen Paper discloses performing a

method in connection to data packets relating to "communication sessions" as

set forth in the asserted claims of the `229 Patent, and thus failed to show that

the 1981 Cohen Paper discloses each and every element of the asserted claims of the `229 Patent.

266.   As set forth in paragraphs 162-165, Witness failed to show by clear and convincing evidence that the 1981 Cohen Paper discloses the "filtering" steps of claims 3 and 13 of the `229 Patent, and thus failed to show that the 1981 Cohen Paper discloses each and every element of the asserted claims of the `229 Patent.

267.   As set forth in paragraphs 166-169, Witness failed to show by clear and convincing evidence that the 1981 Cohen Paper discloses the "analyzing" steps of claims 3 and 13 of the `229 Patent, and thus failed to show that the 1981 Cohen Paper discloses each and every element of the asserted claims of the `229 Patent.

### (3)   **The `586 Patent**

268.   As set forth in paragraph 178, Witness failed to show by clear and convincing evidence that the `586 Patent discloses the operation of steps as set forth in claims 3 and 13 of the `229 Patent, and thus failed to show that the `586 Patent discloses each and every element of the asserted claims of the `229 Patent.

89

269.   As set forth in paragraphs 179-181, Witness failed to show by clear and convincing evidence that the `586 Patent discloses the "analyzing" steps of claims 3 and 13 of the '229 Patent, and thus failed to show that the `586 Patent discloses each and every element of the asserted claims of the `229 Patent.

270.   As set forth in paragraphs 182-185, Witness failed to show by clear and convincing evidence that the `586 Patent discloses claim 7 of the `229 Patent, and thus failed to show that the `586 Patent discloses each and every element of the asserted claims of the `229 Patent.

271.   As set forth in paragraphs 186-187, Witness failed to show by clear and convincing evidence that the `586 Patent discloses claim 8 of the `229 Patent, and thus failed to show that the `586 Patent discloses each and every element of the asserted claims of the `229 Patent.

272.   As set forth in paragraphs 188-189, Witness failed to show by clear and convincing evidence that the `586 Patent discloses claim 15 of the `229 Patent, and thus failed to show that the `586 Patent discloses each and every element of the asserted claims of the `229 Patent.

AO 72A
(Rev.8/82)

### (4)    The Parnes Reference

273.   As set forth in paragraphs 190-195, Witness failed to show any evidence that the Parnes Reference was publicly available prior to the filing date of the application leading to the `229 Patent in 1998, as required for proving anticipation under 35 U.SC. § 102.

274.   As set forth in paragraphs 193-195, Witness failed to show any evidence that the Parnes Reference is sufficiently enabling such that a person of ordinary skill in the art would have been able to make and use the invention claimed in the `229 Patent without undue experimentation at the time the application leading to the `229 Patent was filed, as required for proving anticipation under 35 U.SC. § 102.

275.   As set forth in paragraphs 191-197, Witness failed to show by clear and convincing evidence that the Parnes Reference discloses the operation of steps as set forth in claims 3 and 13 of the `229 Patent, and thus failed to show that the Parnes Reference discloses each and every element of the asserted claims of the `229 Patent.

276.   As set forth in paragraphs 198-199, Witness failed to show by clear and convincing evidence that the Parnes Reference discloses claim 8 of

AO 72A
(Rev.8/82)

the `229 Patent, and thus failed to show that the Parnes Reference discloses each and every element of the asserted claims of the `229 Patent.

277.   As set forth in paragraphs 200-202, Witness failed to show by clear and convincing evidence that the Parnes Reference discloses claim 11 of the `229 Patent, and thus failed to show that the Parnes Reference discloses each and every element of the asserted claims of the `229 Patent.

### (5)   **NEVOT 1992 and 1996**

278.   As set forth in paragraphs 203-204, Witness failed to show any evidence that the NEVOT 1992 or 1996 reference was publicly available prior to the filing date of the application leading to the `229 Patent in 1998, as required for proving anticipation under 35 U.SC. § 102.

279.   As set forth in paragraphs 205-207, Witness failed to show any evidence that NEVOT 1992 or 1996 is sufficiently enabling such that a person of ordinary skill in the art would have been able to make and use the invention claimed in the `229 Patent without undue experimentation at the time the application leading to the `229 Patent was filed, as required for proving anticipation under 35 U.SC. § 102.

280.   As set forth in paragraphs 208-209, Witness failed to show any evidence that NEVOT 1992 or 1996 discloses the operation of steps as set forth

in claims 3 and 13 of the `229 Patent, and thus failed to show that NEVOT 1992 or 1996 discloses each and every element of the asserted claims of the `229 Patent.

281.   As set forth in paragraphs 210-211, Witness failed to show by clear and convincing evidence that NEVOT 1992 or 1996 discloses the "filtering" steps of claims 3 and 13 of the `229 Patent, and thus failed to show that NEVOT 1992 or 1996 discloses each and every element of the asserted claims of the `229 Patent.

282.   As set forth in paragraphs 212-214, Witness failed to show by clear and convincing evidence that NEVOT 1992 or 1996 discloses the "analyzing" steps of claims 3 and 13 of the `229 Patent, and thus failed to show that NEVOT 1992 or 1996 discloses each and every element of the asserted claims of the `229 Patent.

283.   As set forth in paragraphs 215-217, Witness failed to show by clear and convincing evidence that NEVOT 1992 or 1996 discloses claim 8 of the `229 Patent, and thus failed to show that NEVOT 1992 or 1996 discloses each and every element of the asserted claims of the `229 Patent.

AO 72A
(Rev.8/82)

**D.**     **Obviousness**

284.   Obviousness is a question of law to be resolved based on underlying findings of fact. Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1355 (Fed. Cir. 2007), *cert. denied*, 76 USLW 3374 (U.S. Mar. 31, 2008).

285.   "[A] party seeking a judgment that a patent is obvious bears the burden of demonstrating by clear and convincing evidence that the teachings of the prior art would have suggested the claimed subject matter to one of ordinary skill in the art." Union Carbide Chem. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1187 (Fed. Cir. 2002).

286.   On March 6, 2008, the Court held that the opening expert reports of Witness' experts on the issue of validity, Mr. Casner, Dr. Cohen and Dr. Clark, "failed to include any basis for obviousness to which Plaintiff's experts could meaningfully respond." (Doc. No. 333 at 5). The Court also struck all portions of the experts' rebuttal expert reports relating to obviousness and precluded at trial all testimony relating thereto. (Doc. No. 333 at p. 7). Thus Witness experts were precluded from presenting opinion testimony on obviousness as an invalidity defense.

AO 72A
(Rev.8/82)

287.   No testimony or evidence of any kind was provided by Witness that any prior art or any combination of prior art renders the claims invalid based on obviousness.

### E.   **Enablement and Written Description**

288.   Witness failed to provide notice of its invalidity contentions relating to written description and enablement with respect to the asserted claims of the `229 Patent prior to filing its proposed pretrial statement.

289.   LPR 4.3 requires the party opposing a claim of patent infringement to "serve on all parties its Disclosure of Invalidity Contentions...which shall contain...[a]ny grounds of invalidity based on any applicable provision of 35 U.S.C. § 112". LPR 4.3, ND Ga.

290    In Witness's Supplemental LPR 4.3 Disclosures, dated September 9, 2005, Witness included a statement that the asserted claims of the `229 Patent were "invalid under 35 U.S.C. § 112, first paragraph, for lack of written description, enablement, and/or best mode."  *See* Witness' Supp. LPR 4.3 Disclosures (without claim charts) p. 15 (Sept. 9, 2005).

291.   Witness, in support of its position, specifically identifies written description issues with regard to claim 9 of the `229 Patent, stating that it was "indefinite for failing to particularly point out and distinctly claim the subject

AO 72A
(Rev.8/82)

matter.  The 'audio data, video data, or audio and video data' recited in Claim 9

does not have proper antecedent basis." *See* Witness' Supp. LPR 4.3

Disclosures (without claim charts), p.16 (Sept. 9, 2005).

     292.   Claim 9 of the `229 Patent was not asserted by STS at trial.

     293.   Witness incorporated by reference the above statements in its later

LPR 4.3 Disclosures, dated Jan. 29, 2007, Feb. 20, 2007, and Mar. 22, 2007

(attached as Ex. C, without claim charts).

     294.   Witness provided no additional information concerning its written

description and enablement contentions to NICE until trial.

     295.   Each of Witness's invalidity experts, Dr. Cohen, Mr. Casner, and

Dr. Clark, failed to provide any opinion or bases for an opinion on Witness's

invalidity contentions relating to written description and enablement in their

expert reports.

     296.   Dr. Williams, Witness's non-infringement expert, stated in his

rebuttal expert report with respect to the enablement (but not written

description) of the claims:

> Moreover, it is my opinion that the disclosures of the
> patents-in-suit do not enable one of ordinary skill in the
> art at the time of the alleged inventions to practice
> 'conferencing' or 'forwarding'-based recording any

> more than do other disclosures of passive recording
> whether in an IP or other environment.

(Williams Report on Non-Infringement, p. 36, ¶ 128).

297.   8.      Dr. Williams provided no further analysis or support for his

assertion and failed to provide any opinion relating to lack of written

description.

298.   The Court concludes that Witness failed to properly notice its 35

U.S.C. § 112 contentions.  Therefore, the contentions will not be considered by

the Court.

## VII.   SUMMARY OF CONCLUSIONS

299.   For the foregoing reasons and based upon the evidence of record in

this case, the Court holds:

a.      Witness Systems, Inc.'s  Accused Products do not infringe
        the asserted claims of the `229 patent either directly or
        indirectly;

b.      The asserted claims of the `229 patent were not anticipated
        by the prior art references asserted by Witness Systems, Inc.;

c.      The `229 patent is not invalid based upon anticipation,
        obviousness, written description, or enablement;

d.      The Clerk shall enter judgment in favor of Witness Systems,
        Inc. on the claim of infringement and in favor of STS

Software Systems, Ltd. and NICE Systems, Ltd. on the claim of invalidity;

e.      Neither party is entitled to an award of attorneys' fees;

f.      Each party shall bear its own costs.

**SO ORDERED**, this  23rd  day of May, 2008.


_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)